CARROLL v. GOLDSCHMIDT et al.

(Circuit Court of Appeals, Second Circuit. December 1, 1897.)

1. JUDGMENTS—CONCLUSIVENESS—PRIVIES.
    Judgments are binding upon privies as well as upon parties; but only those are privies, within the meaning of the rule, who acquire their interest in the subject-matter of the suit after the commencement of the suit.

2. PATENTS—LEGAL AND EQUITABLE TITLE.
    Persons acquiring the legal title to a patent, with notice of the prior equitable right of another to the invention, take the legal title in subordination thereto, and cannot hold as infringers persons who purchase a patented machine from such equitable owner.

Appeal from the Circuit Court of the United States for the Southern District of New York.

This was a suit in equity by Carroll, as trustee, against Goldschmidt and others, for alleged infringement of certain letters patent for warp knitting machines. The circuit court rendered a decree for the complainant (80 Fed. 520), and the defendants have appealed.

Edwin H. Brown and W. Laird Goldsborough, for appellants.

Arthur v. Briesen, for appellee.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

WALLACE, Circuit Judge. In disposing of this cause we do not find it necessary to consider whether the conclusions of the court below as to the validity of the two patents in suit were correct or not. The record abundantly shows that the property in the inventions claimed in both patents belonged originally to Revis and Payne, jointly, as co-partners, by the style of H. B. Payne & Co.; that it then became part of the assets of the business carried on by them under the style of J. B. Whitehall & Co.; that it passed to Revis exclusively upon the purchase by him of the assets and good will of J. B. Whitehall & Co., and thence passed through him to the firm of Revis, Brewin & Marriott, and upon the retirement from that firm, in 1890, of Brewin, to Revis & Marriott.

The defendants bought the machines of which infringement of the patents is predicated, two of them in 1890 of Revis, Brewin & Marriott, and the other two prior to September, 1891, of Revis & Marriott. They were delivered to the defendants at Nottingham, England, and shortly after were brought to this country by the defendants, and used by them in their factory at New York City. The legal title to the patents at that time was in Henry B. Payne and the firm of A. G. Jennings & Sons, of which parties the present complainant is the trustee, and they had constructive notice of the equitable rights of the vendors of the defendants.

The learned judge who decided the cause in the court below was of the opinion that a decree in a suit brought in November, 1891, by Payne against Revis, was res adjudicata as to the title in favor of Payne and against Revis and these defendants. That decree undoubtedly determined that, as against Revis and his privies, the title to the patent was in Payne and Jennings & Sons, notwithstanding that decree was entered upon a rule pro confesso because of the default of Revis in answering the bill. But the learned judge fell into an error of fact in assuming that the rights of the defendants were acquired subsequent to the commencement of that suit. They were acquired previously, and consequently the defendants were not in privity with Revis or concluded by the decree. Judgments are binding upon privies as well as upon parties, but only those are privies, within the meaning of the rule, who acquire their interest in the subject-matter of the suit subsequent to the suit. Ingersoll v. Jewett, 16 Blatchf. 378, Fed. Cas. No. 7,039. "No one is privy to a judgment whose succession to the rights of property thereby affected occurred previously to the institution of the suit." Freem.

Judgm. § 162. See, also, Campbell v. Hall, 16 N. Y. 575; Doe v. Earl of Derby, 1 Adol. & E. 783; Winslow v. Grindal, 2 Greenl. 64.

It will not be profitable to review extensively the evidence in the record which satisfies us that the equitable title to the inventions of the patents in suit was in Revis and Payne jointly at the time when Payne transferred a half interest therein to the firm of A. G. Jennings & Sons. They were originally patented in England; one patent having been granted to Payne, December 19, 1884, and the other to Payne and Campion, June 4, 1885. The inventions were made by Payne while he was a member of the firm of H. B. Payne & Co. Campion was a workman for the firm, and claims no interest, if he ever had any, in the inventions. That firm carried on business from 1883 to the spring of 1887 at the Boulevard Works, in Nottingham; its business consisting mainly in building warp knitting machines, and selling them to customers in England, the United States, and other countries. In April, 1885, the firm purchased the plant of Whitehall's factory in Nottingham, and subsequently carried on business at that place by the style of J. B. Whitehall & Co. The plant of the Boulevard Works was removed to Whitehall's factory in the spring of 1887, and the two concerns were consolidated, and thereafter the business of both was carried on at Whitehall's factory, under the name of J. B. Whitehall & Co. Payne was a machinist, without means, and Revis furnished the capital for H. B. Payne & Co. and also for J. B. Whitehall & Co. It is not disputed that the firm of J. B. Whitehall & Co. consisted of Payne and Revis. but Payne denies that Revis was his partner in the firm of H. B. Payne & Co., and insists that he was the sole proprietor of the business. On the other hand, Revis testifies that he was a partner with Payne not only in J. B. Whitehall & Co., but also in H. B. Payne & Co., and provided the capital upon the express agreement of Payne that he should have a half interest in the inventions which Payne contemplated and was perfecting in the machines to be built by the firm. Revis' version is corroborated by oral testimony, and seems more consistent with all the probabilities of the case than the version of Payne. That Revis was Payne's partner in the firm of H. B. Payne & Co. appears by documentary evidence, over the signature of Payne, of the most unequivocal character. That the inventions were to be the property of the firm, and after they were perfected were regarded as such by Payne, is convincingly shown by similar documentary evidence, and by the conduct and representations of Payne in the transactions attending the dissolution of the partnership relations. Before applications were made for letters patent in the United States, a license was granted to Julius Kayser, of New York, for the sole privilege of working the machines embodying the inventions in the United States, and the instrument gave him an option to buy the patents for the United States. H. B. Payne & Co. were the parties of the first part named in that instrument. Kayser subsequently concluded not to avail himself of the option, but, acting upon it, he proceeded to prosecute applications for the patents in suit, and the expenses were borne by H. B. Payne & Co. In September, 1887, Payne and Revis entered into a written

agreement for the termination of their co-partnership. It recited their co-partnership in the business of H. B. Payne & Co. as well as of J. B. Whitehall & Co., and provided that upon the payment by Payne to Revis of £3,000, on the 1st day of November next following, Revis should retire from the business, and assign all his share and interest, including "the patents or inventions belonging to or used" in the business. Payne endeavored to procure the firm of A. G. Jennings & Sons to advance the £3,000. The agreement was not carried out, Payne being unable to raise the money. Then Payne and Revis concluded to wind up their co-partnership business, and dispose of the assets and good will through a trustee, and November 23, 1887, they entered into a written agreement appointing Robert Mellors, of Nottingham, a trustee for that purpose. Mellors advertised the partnership estate for sale, but no purchasers were forthcoming. Then negotiations ensued looking to a sale by Mellors to either one of the two partners who should make the most advantageous offer. During this time Payne was in frequent consultation with A. G. Jennings & Sons, and went to New York to see them, contemplating a purchase of the partnership property from Mellors through their assistance. In a written offer made by Payne to Mellors to purchase a part of the assets, Payne specified, among other things, "all the patents or interests in the patents or inventions which Mr. Revis and myself may have as partners, either in the late firm of H. B. Payne & Co. or J. B. Whitehall & Co." Early in February, 1888, Mellors sold the assets and good will of the business to Revis. Up to this time neither Mellors nor Revis was led to suppose that Payne did not propose to recognize the inventions as partnership property, but, as subsequently appeared, he had already transferred to A. G. Jennings & Sons a half interest in the inventions for the United States, and made some arrangements with that firm, the nature of which does not fully appear, by which they were to be ostensibly the owners of the English patents. Throughout the transactions which culminated in the sale by Mellors to Revis the inventions were treated by Payne as appertaining to the partnership assets. The English patents were included in the inventory made by Mellors upon consultation with Payne. The United States patents had not then been granted, but the offer of Payne to Mellors, which has been referred to, mentioned as part of the assets the interest of the firm in the contract with Kayser. Payne's attitude throughout indicates persuasively that he had all along considered the inventions to be partnership property. If this was not his understanding, his conduct can only be explained upon the theory that he deliberately intended to mislead Mellors in exercising the power of sale which had been confided to him. The manufacture and sale of the machines embodying the inventions constituted the principal business of the partnership, and unless the right to make them, to sell them, and to license their use would accompany the sale of the assets and good will, the purchaser would get little of practical value. Payne was aware that Mellors supposed himself to be authorized to transfer this right to a purchaser, and proposed to do so. We cannot doubt that he intentionally gave both Mellors and Revis to understand, not

only that this right would pass to the purchaser, but that the inventions as an entirety were to be regarded as a part of the assets.

A. G. Jennings & Sons purchased their interests in the inventions December 10, 1887. At that time they acquired merely an equitable title, inasmuch as the applications for the patents were pending in the patent office. Their legal title was acquired at the date of the grants of the respective patents, one being granted December 25, 1888, and the other February 5, 1889. There is abundant evidence in the record to indicate that prior to December 10, 1887, A. G. Jennings & Sons were aware that the inventions used in the partnership business of Payne & Revis were claimed to be partnership property by Revis. Irrespective of this, however, they had explicit notice to that effect from Mellors in the letter to them of the date of February 14, 1888, several months before they became invested with the legal title. As purchasers of the equitable title, their rights were subordinate to those of Revis as a joint owner with Payne of the inventions, because his were prior in point of time; and their legal title was subordinate to those rights, because acquired with notice of them.

The defendants, having purchased their machines from vendors who had succeeded to the rights of Revis, occupy the position of their vendors in respect to liability to the complainant. As against those whose title is subordinate to their equities, the defendants acquired the right to use and sell the purchased machines. These conclusions lead to a reversal of the decree of the circuit court.

The decree is reversed, with costs to the appellants, and with instructions to the court below to dismiss the bill of the complainant, with costs.