VILLAGE MILLS CO. v. HOUSTON OIL
CO. OF TEXAS et al. (No. 42.)

(Court of Civil Appeals of Texas. Beaumont.
Jan. 30, 1916. On Motion for Rehearing,
April 15, 1916. On Second Motion for Re-
hearing, May 25, 1916.)

1. COURTS ☞255—FEDERAL COURTS—LIMIT-
ED JURISDICTION.
The federal courts of the United States are
courts of limited jurisdiction.
[Ed. Note.—For other cases, see Courts, Cent.
Dig. §§ 792, 794, 805; Dec. Dig. ☞255.]

2. COURTS ☞307(1)—FEDERAL COURTS—DI-
VERSITY OF CITIZENSHIP.
One of the grounds of jurisdiction of the
federal courts is diversity of citizenship.
[Ed. Note.—For other cases, see Courts, Cent.
Dig. §§ 850, 851, 854; Dec. Dig. ☞307(1).]

3. COURTS ☞315—FEDERAL COURTS—JURIS-
DICTION DEPENDING ON CITIZENSHIP—UN-
INCORPORATED ASSOCIATION—"CITIZEN."
A joint-stock association cannot be a "cit-
izen" within the meaning of the statutes regu-
lating jurisdiction of the federal courts.
[Ed. Note.—For other cases, see Courts, Cent.
Dig. § 861; Dec. Dig. ☞315.]
For other definitions, see Words and Phrases,
First and Second Series, Citizen.]

4. JUDGMENT ☞691—CONCLUSIVENESS—PAR-
TIES CONCLUDED—CESTUI QUE TRUST.
Generally in all proceedings affecting a
trust estate, whether brought by or against
third persons, the trustee and the cestui que
trust are so independent of each other that the
latter must be made a party to the suit in order
to be bound by the judgment or decree therein;
but, if suit is prosecuted or defended in good
faith by a trustee for the beneficiaries with
their knowledge and consent, particularly if at
their request, will be conclusive on them in its
results.
[Ed. Note.—For other cases, see Judgment,
Cent. Dig. § 1214; Dec. Dig. ☞691.]

5. COURTS ☞315—UNITED STATES COURTS—
JURISDICTION—DIVERSE CITIZENSHIP—REP-
RESENTATIVE CAPACITY—TRUSTEE OF JOINT-
STOCK ASSOCIATION.
A declaration of trust of a joint-stock as-
sociation giving trustees full power to act in
all suits relating to the trust estate, and to em-
ploy counsel and commence suits when neces-
sary, gave the trustees thereof such power to
sue and defend suits without joining the stock-
holders that in a suit in a United States court,
in which the trustees were parties, their diverse
citizenship properly alleged gave the court ju-
risdiction.
[Ed. Note.—For other cases, see Courts, Cent.
Dig. § 861; Dec. Dig. ☞315.]

6. JUDGMENT ☞678(7) — CONCLUSIVENESS —
PERSONS CONCLUDED—UNINCORPORATED AS-
SOCIATION STOCKHOLDERS.
A judgment in such an action binds the
stockholders.
[Ed. Note.—For other cases, see Judgment,
Cent. Dig. §§ 1195, 1226; Dec. Dig. ☞678(7).]

7. JUDGMENT ☞625—CONCLUSIVENESS—PER-
SONS CONCLUDED—MUTUALITY OF ESTOPPEL.
In the application of the rule of res ju-
dicata, it is essential that the operation of a
judgment be mutual.
[Ed. Note.—For other cases, see Judgment,
Cent. Dig. § 1140; Dec. Dig. ☞625.]

8. JUDGMENT ☞632—CONCLUSIVENESS—PER-
SONS CONCLUDED.
No person can take advantage of a former
judgment, unless, being a party or privy, he

would have been prejudiced had the decision
been against his interest.
[Ed. Note.—For other cases, see Judgment,
Cent. Dig. § 1148; Dec. Dig. ☞632.]

9. JUDGMENT ☞678(2) — CONCLUSIVENESS —
"PRIVY."
"Privies," in the sense that they are bound
by the judgment, are those who acquired an in-
terest in the subject-matter after the rendition
of the judgment; if their title or interest at-
tached before that fact, they are not bound, un-
less made parties.
[Ed. Note.—For other cases, see Judgment,
Cent. Dig. § 1196; Dec. Dig. ☞678(2).
For other definitions, see Words and Phrases,
First and Second Series, Privy.]

10. ESTOPPEL ☞110—PLEADING—NECESSITY.
It is not necessary, under the plea of not
guilty in an action of trespass to try title, to
plead estoppel before it can be urged as a de-
fense.
[Ed. Note.—For other cases, see Estoppel,
Cent. Dig. § 300; Dec. Dig. ☞110.]

11. JUDGMENT ☞632 — CONCLUSIVENESS —
PRIVIES.
A judgment establishing title of grantor as
against a third party does not inure to the ben-
efit of a grantee in a deed under general war-
ranty made and delivered prior to suit in which
judgment was rendered; nor does it inure to
such grantee's benefit where another deed of the
same property is made to him by grantor after
the suit, for he already had the grantor's full
interest therein under the general warranties
of the prior deed.
[Ed. Note.—For other cases, see Judgment,
Cent. Dig. § 1148; Dec. Dig. ☞632.]

12. APPEAL AND ERROR ☞499(1)—RECORD—
NOT SHOWING REQUEST FOR DIRECTED VER-
DICT.
Where the record does not show appellant
requested a directed verdict, it cannot be urged
as error that such direction was not given.
[Ed. Note.—For other cases, see Appeal and
Error, Cent. Dig. § 2295; Dec. Dig. ☞499(1).]

13. TRESPASS TO TRY TITLE ☞44—TRIAL—
QUESTIONS FOR JURY—FORGERY OF DEED.
In trespass to try title, evidence held to re-
quire submission to jury of question of forgery
of a deed through which plaintiff derived title.
[Ed. Note.—For other cases, see Trespass to
Try Title, Cent. Dig. § 66; Dec. Dig. ☞44.]

14. PLEADING ☞291(4) — EFFECT OF AFFIDA-
VIT OF FORGERY—BURDEN OF PROOF.
In trespass to try title, filing by defendant
of affidavit of forgery of deed through which
plaintiff derived title put upon plaintiff the bur-
den of proving the execution of the deed.
[Ed. Note.—For other cases, see Pleading,
Cent. Dig. §§ 869, 869½; Dec. Dig. ☞291
(4).]

15. EVIDENCE ☞178(2), 182—BEST AND SEC-
ONDARY—PRELIMINARIES TO ADMISSION OF
SECONDARY EVIDENCE.
Before secondary evidence of the contents
of an alleged deed is competent, proof must be
made of its existence, execution, delivery, and
acceptance, and its loss or absence must be sat-
isfactorily explained.
[Ed. Note.—For other cases, see Evidence,
Cent. Dig. §§ 582, 602; Dec. Dig. ☞178(2),
182.]

16. EVIDENCE ☞182—BEST AND SECONDARY
—PRELIMINARIES TO ADMISSION OF SECON-
DARY EVIDENCE — EXISTENCE OF PRIMARY
EVIDENCE.
In trespass to try title, the recording of a
deed and an original receipt for it by a clerk of
county court was sufficient evidence of its ex-

istence as preliminary to admission by secondary evidence.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 601–604; Dec. Dig. ☞182.]

17. DEEDS ☞194(5) — EVIDENCE ☞182 — BEST AND SECONDARY—PRELIMINARY SHOWING—DELIVERY OF DEED.

The fact that a deed was recorded raises a presumption of its delivery which is sufficient proof of delivery preliminary to the admission of secondary evidence of the deed.

[Ed. Note.—For other cases, see Deeds, Cent. Dig. §§ 580, 634; Dec. Dig. ☞194(5); Evidence, Cent. Dig. §§ 601–604; Dec. Dig. ☞182.]

18. EVIDENCE ☞182—BEST AND SECONDARY—PRELIMINARY SHOWING—ACCEPTANCE OF DEED.

Evidence of a claim under a deed and subsequent transfers making a claim of title depending on it sufficiently show its acceptance as preliminary to the admission of secondary evidence of the deed.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 601–604; Dec. Dig. ☞182.]

19. PLEADING ☞304(1) — AFFIDAVIT OF FORGERY—EFFECT.

In trespass to try title, where defendant filed an affidavit of forgery, the age of the deed, its registration, certified copies of the original recorded in two counties, and evidence of long and continuous assertion of claim thereunder, with presumption of innocence, held sufficient to meet the burden of proof of genuineness cast on plaintiff by the affidavit.

[Ed. Note.—For other cases, see Pleading, Cent. Dig. §§ 908, 909; Dec. Dig. ☞304(1).]

20. ADVERSE POSSESSION ☞115(1) — EVIDENCE—QUESTIONS FOR JURY.

In trespass to try title, evidence of plaintiff's title by adverse possession held to be such as to require submission thereof to the jury.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 691, 701; Dec. Dig. ☞115(1).]

On Motion for Rehearing.

21. TRESPASS TO TRY TITLE ☞27—PARTIES.

Vernon's Sayles' Ann. Civ. St. 1914, art. 7735, providing that, where a party is sued for land, the real owner or warrantor may make himself, or be made a party defendant to the suit, and shall be entitled to make such defense as if he had been the original defendant in the action, does not dispense with the rule that requires parties really owning the title to land to be affected by judgment disposing of the title to be made parties to the suit.

[Ed. Note.—For other cases, see Trespass to Try Title, Cent. Dig. § 33; Dec. Dig. ☞27.]

22. ADVERSE POSSESSION ☞112—BURDEN OF PROOF.

The burden of proving adverse possession is in all cases upon the one who sets it up and claims under it.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. § 661; Dec. Dig. ☞112.]

23. ADVERSE POSSESSION ☞114(1) — EVIDENCE—SUFFICIENCY.

The evidence establishing adverse possession ought not to be vague and uncertain.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 682, 683; Dec. Dig. ☞114(1).]

24. ADVERSE POSSESSION ☞31—VISIBLE AND NOTORIOUS POSSESSION.

To make a good claim by adverse holding, the true owner must have actual knowledge of the hostile claim, or the possession must be so open, visible, and notorious as to raise the presumption of notice to the world that the rights of the true owner are invaded intentionally and with the purpose to assert claims of title adversely to him, so patent that the owner could not be deceived in the exercise of ordinary prudence as to the situation.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 128–133; Dec. Dig. ☞31.

For other definitions, see Words and Phrases, First and Second Series, Adverse Possession.]

25. ADVERSE POSSESSION ☞31—VISIBLE AND NOTORIOUS POSSESSION.

In determining whether possession is open, visible, and notorious so as to charge the owner with notice of an adverse claim, the nature, situation, and use of the property are to be considered, as well as the quantity or proportion of the land actually occupied.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 128–133; Dec. Dig. ☞31.]

26. ADVERSE POSSESSION ☞71(3)—COLOR OF TITLE—FIVE-YEAR STATUTE.

Under the five-year statute, it is not necessary that the grantor should have had title to the land in order that the deed given by him may convey color of title.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 422, 423; Dec. Dig. ☞71(3).]

27. ADVERSE POSSESSION ☞100(1)—EXTENT OF POSSESSION UNDER COLOR OF TITLE.

Generally, where one enters under color of title into the actual occupancy of part of the premises described in the instrument giving color of title, his possession is not considered as confined to that part of the premises in his actual occupancy, but he acquires possession of all the land embraced in the instrument.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. § 547; Dec. Dig. ☞100(1).]

28. ADVERSE POSSESSION ☞100(1)—EXTENT OF POSSESSION—CONSTRUCTIVE POSSESSION.

Under the Texas statute of five years (Vernon's Sayles' Ann. Civ. St. 1914, art. 5674), which specifically requires "cultivation, use or enjoyment of the land," there must be evidence of an open, notorious exercise or control or dominion over all of the land in controversy before the benefits of constructive possession under color of title will avail the claimant so as to perfect limitation under that statute.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. § 547; Dec. Dig. ☞100(1).]

29. ADVERSE POSSESSION ☞100(6)—EXTENT OF POSSESSION — CONSTRUCTIVE POSSESSION UNDER RESTRICTED LEASE.

One can claim adverse possession by tenant to only the cleared part of land in dispute where the tenant's lease restricts his use of the premises to farming purposes only, with a prohibition against cutting or destroying any timber.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 563–566, 568–571, 573; Dec. Dig. ☞100(6).]

30. ADVERSE POSSESSION ☞100(1)—EXTENT OF POSSESSION BY TRUE OWNER.

The true owner of land has constructive possession and seisin of all the land to which he has title if there be no other person in possession.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 547, 554; Dec. Dig. ☞100(1).]

31. ADVERSE POSSESSION ☞103—EXTENT OF POSSESSION UNDER COLOR OF TITLE.

If a person other than the true owner be in possession of part of premises under color of title giving boundaries, such possession, if adverse, though under inferior title, will create

a disseisin of the holder of the superior title to the extent of the boundaries contained in the inferior title, except as to such part as is in actual possession of the holder of the superior title.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 590–594; Dec. Dig. ☞103.]

32. ADVERSE POSSESSION ☞97—EXTENT OF POSSESSION WITHOUT CLAIM OF RIGHT OR COLOR OF TITLE.

If the adverse possessor be without deed or other written memorandum defining the possession, and is a mere naked trespasser, his possession will be confined to the extent of the actual enclosure.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. § 537; Dec. Dig. ☞97.]

33. ADVERSE POSSESSION ☞100(1)—VISIBLE AND NOTORIOUS POSSESSION — FIVE-YEAR STATUTE.

Under the five-year statute of limitations, to gain title there must be an open, notorious exercise of dominion and control over all the land claimed under color of title in order to constructively extend the limits of actual possession of a part of the land to the boundaries included under the color of title.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. § 547; Dec. Dig. ☞100(1).]

On Second Motion for Rehearing.

34. COURTS ☞247(7)—APPELLATE JURISDICTION — TEXAS — CERTIFICATION TO SUPREME COURT BY COURT OF CIVIL APPEALS.

A question already determined by the Supreme Court will not be certified to it, although there may be a conflict with the subsequent decision of a Court of Civil Appeals.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 752; Dec. Dig. ☞247(7); Appeal and Error, Cent. Dig. §§ 863, 1773.]

35. COURTS ☞247(7)—APPELLATE JURISDICTION — TEXAS — CERTIFICATION TO SUPREME COURT BY COURT OF CIVIL APPEALS.

The decision of a Court of Appeals conflicting with the decision of another Court of Appeals on the same question necessitates a certification of the question for final adjudication to the Supreme Court.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 752; Dec. Dig. ☞247(7); Appeal and Error, Cent. Dig. § 863.]

Appeal from District Court, Hardin County; J. Llewellyn, Judge.

Action by the Houston Oil Company of Texas against the Village Mills Company and others. From a judgment for plaintiff, defendant Village Mills Company appeals. Certified to Supreme Court.

W. D. Gordon, Thos. J. Baten, H. M. Whitaker, E. E. Easterling, and Hightower, Orgain & Butler, all of Beaumont, for appellant. D. F. Singleton, of Kountz, J. F. Lanier, of Beaumont, Parker & Kennerly, of Houston, and H. O. Head, of Sherman, for appellees.

CONLEY, C. J. This was an action of trespass to try title, instituted by Houston Oil Company of Texas against the Village Mills Company, in which the D. C. Montgomery league of land in Hardin county was involved. The appellant, by cross-action, brought in the Maryland Trust Company, alleging that it was asserting some sort of lien or claim on the land by reason of a deed of trust executed for its benefit by the Houston Oil Company. In addition to the plea of not guilty, the appellant also answered that it had matured title under the three, five, and ten year statutes of limitation. The Houston Oil Company also alleged in its petition that, in addition to holding the fee-simple title to the land, it had acquired a good and perfect title under the three, five, and ten year statutes of limitation. After the evidence for both sides had been submitted, the court gave a peremptory instruction to the jury to render a verdict for appellees, which was done, and the judgment entered accordingly, from which the appellant has perfected an appeal.

Appellee Houston Oil Company's title is deraigned as follows: Mexican government to D. C. Montgomery, one league of land August 29, 1835; D. C. Montgomery to Samuel Moore, warranty deed June 5, 1838; Samuel Moore, by attorney, to Mary E. Brown, August 10, 1849; Mary Brown Frazier and husband to T. J. Word, deed dated January 19, 1855; T. J. Word to George F. Moore, December 8, 1858; George F. Moore to Susan B. Moore, December 7, 1860; T. J. Word to Susan B. Moore, partition deed July 5, 1866; Susan B. Moore and George F. Moore to John P. Irvin, August 4, 1881; John P. Irvin to Texas Pine Land Association, December 11, 1891; Texas Pine Land Association, by its trustees, to Houston Oil Company of Texas, special warranty deed dated July 31, 1901, and also by deed of date December 5, 1914.

Appellant filed an affidavit of forgery against the deed from D. C. Montgomery to Samuel Moore, of date June 5, 1838. Appellant's record title shows that it claims to have the fee in the league of land under the following instruments: Mexican government to D. C. Montgomery, August 29, 1835; D. C. Montgomery to Arthur Henry, deed January 27, 1836; Arthur Henry to Samuel Beresford, February 27, 1845; heirs of Samuel Beresford to W. W. Clippinger, power of attorney February 19, 1901; heirs of Samuel Beresford, by attorney, to Brackin and Hooks, by deed dated March 28, 1914; Hooks and Brackin to Village Mills Company, April 7, 1914.

The records and briefs are voluminous, and many assignments of error are presented, but the judgment of the lower court must be sustained, unless three contentions urged by the appellant can be successfully maintained, viz.:

First. That the judgment of the United States Circuit Court at Beaumont in November, 1903, against the Beresfords, appellant's predecessors in title, was not valid and binding; that judgment having been interposed by appellees as an estoppel in this suit against

the appellant's assertion of title to the land in question.

Second. That the record in the case required a submission to the jury of the question of forgery of the deed from Montgomery to Moore, against which an affidavit of forgery had been filed.

Third. That neither the three, five, or ten year statutes of limitation were established by the uncontroverted testimony in favor of appellees and those through and under whom they claim.

We will therefore consider these questions in the order in which they are stated, rather than follow the numerical assignment of them as found in the briefs.

On November 11, 1901, Richard Beresford and others, the heirs of Samuel Beresford, alleging themselves to be citizens of the states of Ohio, Illinois, and Pennsylvania, through their attorney, W. W. Clippinger, and other counsel, filed in the United States Circuit Court for the Eastern District of Texas, at Beaumont, suit No. C. L. 94, styled Richard Beresford et al. v. Texas Pine Land Association, wherein the plaintiffs in said suit were alleged to be the owners in fee simple and entitled to the possession of the D. C. Montgomery league in Hardin county, Tex., the same land which is here involved, such suit being an action in trespass to try title, and, among other things, the petition contained the following language:

"Complaining of the Texas Pine Land Association, which is a joint-stock association, having its principal office in Houston, Harris county, Tex., and its trustees, Clerendon Harris, who resides in Tyler county, Tex., and Thomas S. Nelson, Horatio R. Fletcher, and Francis Peabody, Jr., the last-named three trustees being residents of Suffolk county, Mass," etc.

Also such petition contained the following allegation:

"As to said Texas Pine Land Association, plaintiff alleges that service on the above-named three trustees is sufficient; that plaintiff knows of no other shareholders or persons interested in or owning any interest in said Texas Pine Land Association, save and except the above-named trustees."

The rest of the petition was in ordinary form of trespass to try title.

The Texas Pine Land Association and the trustees of the Texas Pine Land Association, except Clerendon Harris, who was dismissed from the suit, answered in said cause, and excepted to plaintiff's petition generally and on the ground of want of jurisdiction, entering also the ordinary plea of not guilty and the plea of general denial, and pleas of limitation under the three, five, and ten year statutes. This answer was filed August 26, 1902. The exceptions to the jurisdiction and otherwise were not sustained, and, the cause coming on for trial, all the defendants were dismissed except the Texas Pine Land Association and its trustees, Thomas S. Nelson, Horatio R. Fletcher, and Francis Peabody, Jr., and judgment was rendered on November 26, 1903, that plaintiffs take noth-ing by their suit, and judgment was also rendered that the defendants recover from the plaintiffs all costs. A certified copy of this judgment was filed in Hardin County, Tex., January, 1906.

Appellant's ninth and tenth assignments of error attack the action of the court in allowing the introduction of the pleadings and the judgment in the federal suit, for the purpose of proving an estoppel in this cause, for the following reasons, to wit:

(a) The federal court was without jurisdiction, and the proceedings were void.

(b) The record affirmatively shows that the Texas Pine Land Association and its trustees had previous to the institution of the suit, to wit, on July 31, 1901, conveyed the entire interest and estate that they had in the land in controversy to the Houston Oil Company of Texas, whereas the suit referred to was instituted on the 11th day of November, 1901, at a time when the Texas Pine Land Association had no interest whatever in said land.

(c) Not necessary to consider under the disposition we make of the case.

(d) Because there was no pleading of estoppel or res adjudicata by plaintiff as the basis for the introduction of any such evidence.

The first proposition urged under these two assignments is, in substance, that the defendant in that suit, being a joint-stock association, was a mere partnership, and therefore not a citizen of the United States, within the meaning of the statutes of the United States imposing jurisdiction upon the federal court by reason of diversity of citizenship, and on this account the federal court at Beaumont did not have jurisdiction of the suit brought by said plaintiffs, although citizens of other states, and that the judgment rendered in said cause was therefore a nullity, and could be collaterally impeached whenever and wherever it was brought in question.

[1, 2] The federal courts of the United States are courts of limited jurisdiction, and can only exercise their powers within prescribed limits. One of the grounds of jurisdiction of that court, and that upon which its action was invoked in the case of Beresford v. Texas Pine Land Association, supra, was diversity of citizenship of the parties to that action.

[3] It is now the settled rule, under the decisions of the United States Supreme Court, that a joint-stock association cannot be a "citizen," within the meaning of the statutes regulating jurisdiction of the federal court.

In the case of Chapman v. Barney, 129 U. S. 677, 9 Sup. Ct. 426, 32 L. Ed. 800, that court said:

"On looking into the record we find no satisfactory showing as to the citizenship of the plaintiff. The allegation of the amended petition is, that the United States Express Company is a joint-stock company organized under

a law of the state of New York, and is a citizen of that state. But the express company cannot be a citizen of New York, within the meaning of the statutes regulating jurisdiction, unless it be a corporation. The allegation that the company was organized under the laws of New York is not an allegation that it is a corporation. In fact, the allegation is that the company is not a corporation, but a joint-stock company—that is, a mere partnership. And, although it may be authorized by the laws of the state of New York to bring suit in the name of its president, that fact cannot give the company power, by that name, to sue in a federal court."

Again, in the case of Great Southern Fireproof Hotel Co. v. Jones, 177 U. S. 449, 20 Sup. Ct. 690, 44 L. Ed. 842, the court says:

"A limited partnership association created under Pennsylvania laws of 1874 (page 271), although it may be called a quasi corporation and is declared by the state statute to be a citizen of the state, is not, like a corporation created under the laws of the state, to be deemed a citizen of that state, within the meaning of the clause of the federal Constitution which extends the judicial powers * * * to controversies between citizens of different states. The citizenship of the individual members of a limited partnership association created by the laws of Pennsylvania must be alleged in a suit by that association in a federal court, where jurisdiction depends upon diverse citizenship of the parties."

These two opinions are decisive of the point under investigation, and it is obvious that the law did not authorize a suit in the federal court against the Texas Pine Land Association as a joint-stock association. Counsel for appellees do not dispute the legal effect of these two decisions, but seek to sustain the jurisdiction of the federal court on the theory:

(1) That, the court having taken jurisdiction of said cause and adjudicated the matters in said suit, although erroneously, still said judgment is not void, but only voidable, and, not having been appealed from, is binding upon the parties.

(2) That, if it be determined that the Texas Pine Land Association is a partnership, still there was no defect in the jurisdiction, because it did not appear that there was any member of such partnership who was not before the court, but, on the contrary, on the face of their original and amended petition, the plaintiffs in that suit alleged that all persons known to have had any interest in the Texas Pine Land Association were parties defendant, and, the requisite diversity of citizenship of such defendants being alleged, the court had jurisdiction to try the suit.

(3) Upon the theory also that the Texas Pine Land Association was a trust estate, represented by three trustees, and they being properly before the court, and the record showing that such trustees had the requisite diversity of citizenship, the federal court thereby had jurisdiction.

The decisions of the Supreme Court of the United States, Cutler v. Houston, 158 U. S. 423, 15 Sup. Ct. 868, 39 L. Ed. 1040, Evers v. Watson, 156 U. S. 527, 15 Sup. Ct. 430, 39 L. Ed. 520, Dowell v. Applegate, 152 U. S.

327, 14 Sup. Ct. 611, 38 L. Ed. 463, and Des Moines Navigation & Railroad Co. v. Iowa Homestead Co., 123 U. S. 552, 8 Sup. Ct. 217, 31 L. Ed. 212, seem to support appellees' theory that the judgment was only voidable, and not void; but since taking the view of this case that we do, we find it unnecessary to determine this question.

It is to be noted in the quotation heretofore made from the allegations of the petition in the federal suit that the plaintiffs alleged, after joining the trustees, that:

"Plaintiffs know of no other shareholders or persons interested in or owning any interest in said Texas Pine Land Association, save and except said above-named trustees."

A careful scrutiny of said petition does not disclose any language expressive of the purpose or intent upon the part of the plaintiffs to sue the defendant as a partnership, nor the individual defendants named as partners; but, on the contrary, the language used shows a clear and unmistakable purpose to sue the defendant as a joint-stock association, and the individuals named, in their representative capacity, as trustees; in other words, to sue the trust estate in the person of said trustees. We cannot hold the language of the petition is such as to constitute the suit in question as one against a partnership and against the individuals named therein as partners, and therefore we do not think that appellees' contention upon this point is well taken. It is to be noted that in the federal court suit the joint-stock association was not only mentioned as a defendant, but also the three trustees acting for said association, thus signifying an effort to reach the trust estate through the three named trustees.

[4] The general rule is that in all proceedings affecting a trust estate, whether brought by or against third persons, the trustee and the cestui que trust are so independent of each other that the latter must be made a party to the suit in order to be bound by the judgment or decree rendered therein. Black on Judgments (2d Ed.) vol. 2, § 585. But it is also the rule that a suit prosecuted or defended in good faith by a trustee for the beneficiaries, with their knowledge and consent, or more particularly at their request, will be conclusive on them in its results. Hornsby v. City National Bank (Tenn. Ch. App.) 60 S. W. 160; Bracken v. Atlantic Trust Co., 36 App. Div. 67, 55 N. Y. Supp. 506; Black on Judgments (2d Ed.) vol. 2, § 585.

By the express provision in the declaration of trust signifying the agreement between the trustees and the stockholders of the Texas Pine Land Association, which declaration of trust was recorded in the deed records of Hardin county, Tex., on August 10, 1894, it is provided:

"Article 1. The name of this trust or association shall be the Texas Pine Land Association.

"Art. 2. The trustees shall hold all of the real

estate and other property now belonging to or vested in them as trustees of the Texas Pine Land Association as joint tenants, and not as tenants in common, in trust for the benefit of the shareholders, in proportion to the number of shares held by them in this trust.

"Art. 3. Shareholders in said association shall have no legal rights to the trust property, either real or personal, held from time to time by said trustees, and especially shall they have no right to call for any partition thereof, but the shares shall be personal property, carrying the right of division of profits, and, at the termination of said trust, the division of principal and profits.

"Art. 4. The death of a shareholder during the continuance of this trust shall not operate to determine the trust, nor shall it entitle the legal representatives of a deceased shareholder to an accounting of or to take any action in the courts, or otherwise, against the trust or the trustees, but the executors, administrators, or assigns of the deceased shall succeed to all rights of said decedent under this trust. * * *

"Art. 7. The officers of said association shall consist of a board of three trustees. * * * In the month of June, A. D. 1886, and biennially thereafter, the trustees of the association shall be elected by the shareholders for the term of two years and until their successors shall have been elected and qualified; and each board shall succeed to the powers and duties of its predecessor.

"Art. 8. The trustees shall have full power and authority, except as they shall be instructed by the shareholders, as hereinafter provided: * * *

"(2) To act in all suits and legal proceedings relating to the trust estate in any courts of law or equity, and before other bodies and tribunals, to employ counsel and to commence suits and proceedings, and to compromise or submit to arbitrations all matters of dispute to which the trust or the trustees may be a party, when in their judgment necessary or proper. * * *

"(5) * * * To sell the said trust lands and property, and all property, real or personal, conveying said trust lands in fee simple or for a less estate, free and discharged of all trusts, at public auction, or by private contract of sale, at such times during the continuance of this trust, etc., either for cash or credit, or as may seem to them judicious, without the necessity of applying to any court or to the beneficiary under the trust for leave to do so, * * * and all grantees from the trustee shall acquire thereby a good and absolute title to the property conveyed to the extent proposed to be conveyed, free and discharged from all trusts, and shall not be obliged to see the application of the purchase money therefor, nor to require any evidence of the accounting to this association. * *. *

"Art. 11. Also upon the resignation, death, removal, or inability of any trustee to serve in such capacity, and upon the election of any successor in his stead, as hereinabove provided, the surviving or resigning trustee or trustees shall execute with and deliver to the successors in trust all deeds, conveyances, transfers, and assignments needful or proper under the circumstances to vest all the trust property and estate of said association in the new trustees or new board of trustees in like manner and with the same powers and duties as the title and ownership of said property was vested in the original board of trustees.

"Art. 12. The trustees by vote of majority of the board shall have full power as trustees, attorneys, and agents on behalf of said association to do all things in their judgment necessary and prudent for the purchase of land and the sale of stumpage therefrom, and the conduct of said management of the property and business requisite and desirable for the purposes of said association as hereinafter set forth. * * *.

"Art. 28. The foregoing by-laws and any amendments or alterations of same that may be made may be recorded in part or in whole, wherever necessary whenever it may be advisable to do so, to give title to any of the lands to be sold; and the trustees and the secretary then of record are hereby authorized to execute and record all certificates required to effect such conveyances."

[5, 6] We think it was clearly the purpose and intention of this instrument to authorize the trustees to handle the property generally, and to sue, prosecute, and defend suits in their capacity as trustees, without joining the cestui que trust or stockholders, and under such circumstances any judgment that might be rendered in the nature and character of a suit as that in the federal court brought by the Beresford heirs would be binding upon the stockholders and the trust estate, even though such stockholders were not joined as parties to that suit. We therefore think that, the record in said suit showing that the trustees were properly before the court, and showing, further, the requisite diversity of citizenship, the jurisdiction of the court as to them in their representative capacity attached, and the court therefore had jurisdiction to try the cause.

[7] In the application of the rule of res adjudicata it is essential that there not only be a valid judgment, but that its operation be mutual. Therefore a party will not be concluded against his contention by a former judgment, unless he could have used it as a protection or as a foundation of a claim had the controversy been the other way; and, conversely, no person can claim the benefit of a judgment as an estoppel upon his adversary, unless he would have been prejudiced by a contrary decision of the case. Black on Judgments, § 828.

[8] On the principle that estoppel must be mutual, no person is allowed to take advantage of a former judgment or decree, as decisive in his favor of a matter in controversy, unless, being a party or privy thereto, he would have been prejudiced by the same had the decision been against his interest. Id. 808.

[9] Privies, in the sense that they are bound by the judgment, are those who acquired an interest in the subject-matter after the rendition of the judgment; if their title or interest attached before that fact, they are not bound, unless made parties. Id. § 832.

Revised Statutes, art. 7758 (Vernon's Sayles'), following this general doctrine, provides:

"Any final judgment rendered in any action for the recovery of real estate shall be conclusive as to the title or right of the persons established in such action, upon the party against whom it is recovered, and upon all other persons claiming from, through or under such party, by title arising after the commencement of such action."

Speaking of this statute, in the case of Stout v. Taul, 71 Tex. 444, 9 S. W. 331, the Supreme Court says:

"This [the statute] restricts the conclusive effect of the judgment to the parties in legal effect before the court where it is rendered, makes certain by the record the extent and effect of the judgment, and avoids all the uncertainty in reference to such judgments as would result if evidence outside the record might be resorted to for the purpose of showing who are bound by a judgment, or, in other words, who were parties to the action. It establishes a rule consistent with the principle of justice, which denies the effect to a judgment against any one not brought before the court rendering it in some mode prescribed by law, except as to those claiming through a party to such action through inheritance or representative, or by conveyance made pending or after the commencement of the action."

It appears in the instant case that the Texas Pine Land Association, acting through its trustees, had conveyed the league of land in controversy to the Houston Oil Company by deed, not only executed, but recorded prior to the institution of the federal court suit.

Now, applying these well-established rules to the case under investigation, can it be said that, had the decision in the Beresford suit against the Texas Pine Land Association been adverse to the latter, such judgment could have been pleaded in bar of the instant case by the appellant as an estoppel against the Houston Oil Company? We think not. The decisions of the courts of the land are almost unanimous on the subject.

The case of Elliott v. Morris, 49 Tex. Civ. App. 527, 121 S. W. 209, is in point. In that case it appears that the state of Texas had patented a section of land to one Logan on November 4, 1900. On January 21, 1901, Logan conveyed the land to J. A. Elliott. On February 7, 1901 (about a month after the land had been conveyed by Logan to Elliott), I. C. Morris instituted suit against Logan to recover the land, and thereafter, on April 18, 1901, recovered judgment therein. Some time about the year 1905 the appellant- in the case supra, J. A. Elliott, filed suit in trespass to try title to recover the same section of land from I. C. Morris. The trial court permitted the introduction of the judgment theretofore obtained by Morris in the suit against Logan, under the appellee's plea of res adjudicata. Referring to this matter on appeal, the court said:

"The judgment relied upon as being conclusive of the controversy between the parties to this suit was rendered April 18, 1901, in a statutory action of trespass to try title brought by appellee against appellant February 7, 1901. On the face of the record of that suit appellant was not a party to it. * * * We do not think, in any view of the law, that the connection appellant * * * had with the suit * * * should be held to operate to conclude him from asserting the title he is here asserting to the land. But there is another view, precluding such a result, to be taken of the case. The Morris suit against Logan was the statutory action of trespass to try title. The law then and now in force declares that 'any final judgment rendered in any action for the recovery of real estate hereafter commenced shall be conclusive as to the title or right of possession established in such action upon the party against whom it is recovered, and upon all persons claiming from,

through, or under such party, or by title arising after the commencement of such action.' * * * Construing the statute quoted, Chief Justice Stayton, in Stout v. Taul, 71 Tex. 444 [9 S. W. 329], says: [Same as above quoted.] So construed, it seems to us the statute must be held to be conclusive of the question made on this appeal. The trial court should not have submitted, as an issue to be determined by the jury, appellee's plea of res adjudicata. The plea on its face was insufficient, and the evidence admitted under it did not present a defense to appellant's suit."

In the case of Dull v. Blackman, 169 U. S. 243, 18 Sup. Ct. 333, 42 L. Ed. 733, the Supreme Court of the United States on the same subject said:

"It further appears from the findings of fact made by the trial court in Iowa, and sustained by the Supreme Court of that state, that the entire right and title had passed from Blackman to Phelan in September, 1892, nearly two months before the commencement of the suit in New York. * * *

"We remark again that, while a judgment or decree binds, not merely the party or parties subject to the jurisdiction of the court, but also those in privity with them, yet that rule does not avail the plaintiffs in error, for Phelan acquired his rights prior to the institution of the suit in New York, and was therefore not privy to that judgment. 'It is well understood, though not usually stated in express terms in works upon the subject, that no one is privy to a judgment whose succession to the rights of property thereby affected occurred previously to the institution of the suit. A tenant in possession prior to the commencement of an action of ejectment cannot therefore be lawfully dispossessed by the judgment unless made a party to the suit. * * * No grantee can be bound by any judgment in an action commenced against a grantor subsequent to the grant, otherwise a man having no interest in property could defeat the estate of the true owner. The foreclosure of a mortgage, or of any other lien, is wholly inoperative upon the rights of any person not a party to the suit, whether such person is a grantee, judgment creditor, attachment creditor, or lienholder.' * * *

"As Phelan was not brought within the jurisdiction of the New York court, and as the suit in that court was instituted nearly two months after he had acquired full title to the real estate, the decree of that court did not bind him as a party, nor bind him as in privity with Blackman, his grantor. The Supreme Court of Iowa did not err in so holding."

In the case of Cook v. Lasher, 73 Fed. R. 701, 19 C. C. A. 654, it was held:

"A decree canceling the debt of a commissioner of school lands in a suit against the commissioner's grantee does not affect the right of one to whom the grantee conveyed before the commencement of the suit, and who was never served with process, and never became a party."

For other cases in point see Southern Bank & Trust Co. v. Folsom, 75 Fed. 929, 21 C. C. A. 568; Carroll v. Goldschmidt, 83 Fed. 508, 27 C. C. A. 566; Hunt v. Haven, 52 N. H. 162; Bennett v. Gray, 92 Hun, 86, 38 N. Y. Supp. 372; Moreland v. Frick Coke Co., 170 Pa. 33, 32 Atl. 634; Bensimer v. Fell, 35 W. Va. 15, 12 S. E. 1078, 29 Am. St. Rep. 774; Hodge v. Hodge, 56 S. C. 263, 34 S. E. 517; Garrard v. Hull, 92 Ga. 787, 20 S. E. 357; Elwell v. New England Loan Security Co., 101 Ga. 496, 28 S. E. 833; Patapsco Guano Co. v. Hurst, 106 Ga. 184, 32 S. E. 136; Roulston v. Hall, 66 Ark. 305, 50 S. W. 690,

74 Am. St. Rep. 97; Gregory v. Clabrough's Executors, 129 Cal. 475, 62 Pac. 72; Gage v. Parker, 178 Ill. 455, 53 N. E. 317; Freeman on Judgments (1st Ed.) § 162.

The fact that the Texas Pine Land Association, through its trustees, had previously sold said land to the Houston Oil Company under a special warranty deed, will not alter the rule. Under that deed there was a responsibility over against the Texas Pine Land Association under the implied covenants, as grantor to the Houston Oil Company. The obligation arising on said covenant was to the Houston Oil Company and its successors in title. Under that contract, if the title to the land conveyed had been in any manner contrary to the covenants, the Houston Oil Company had the right to vouch in its grantor to defend the title. This right was in the nature of a privilege. The Houston Oil Company, had it seen fit so to do, might have waived such a privilege, and made defense of the suit itself, and in such event the Beresford heirs were not in any position to make any objection thereto. The contract under the covenants in said deed was one in which the Beresfords were not in any way concerned. They were not parties nor privies to it, and could not take advantage of nor be prejudiced by its existence or any of its provisions. The deed in question conveyed all the right, title, and interest in the land, in so far as the Texas Pine Land Association and its trustees were concerned, to the Houston Oil Company. In so far as the title to the land—the subject-matter of the litigation in the federal court suit—was concerned, the Texas Pine Land Association and its trustees had no interest.

The judgment in the Beresford suit certainly lacked mutuality in so far as it affected the Houston Oil Company, and therefore could not constitute an estoppel in its favor.

Counsel for appellees rely upon the case of Kramer v. Breedlove (Sup.) 3 S. W. 561, to sustain the admissibility of the judgment in question as res adjudicata. In that case the Supreme Court, speaking through Justice Stayton, said that, where one had sold and conveyed land under a general warranty deed, and thereafter brought an action in his own name to quiet the title, the decree rendered in the action in his favor inured to the benefit of his vendee, although the vendee was not a party to the action. An examination of that case, however, shows the following state of facts: That W. G. Wilkins sold and conveyed two tracts of land to A. Kramer on October 10, 1881, in which Kramer executed as part of the purchase price two notes, one due January 1, 1882, and the other due January 1, 1883, and in the conveyance a vendor's lien was reserved to secure the payment of the notes. Subsequently the notes were transferred to C. R. Breedlove. After he came in possession of the notes a dispute arose between Wilkins and Kramer about the marketableness of the title to one of the tracts included in the deed of conveyance, and it was agreed between all the parties concerned—that is to say, between Wilkins, Kramer, and Breedlove—that Kramer would pay one of the notes, and that the other was not to be paid until Wilkins had cleared the title to the tract of land in dispute. In furtherance of this agreement, Wilkins filed suit against one Evans, who was asserting some claim against said tract of land, alleging that he (Wilkins) was the owner of the land, and recovered a judgment clearing up the title to said tract. Breedlove claimed that Wilkins had performed his part of the agreement, and thereupon brought suit against Kramer on the second note, and Kramer defended on the ground that Wilkins, having sold the land before that suit was brought, had no such interest as made him a proper party, and therefore the judgment in his favor would not be available as res adjudicata to Kramer if the children of Evans should thereafter sue him for the land. The Supreme Court held that Kramer was bound by this judgment, and that it could be properly interposed as a plea of res adjudicata. It is to be noted, however, that there was a specific agreement between all the parties concerned that such judgment should be binding, and we think the language of the Supreme Court in the Breedlove Case should be considered in connection with the facts involved in that suit, and not as establishing a broad doctrine in this state contrary to the well-established rule affecting judgments of this nature, when pleaded as res adjudicata.

Again, appellees urge upon us as sustaining their plea of res adjudicata the case of Powell v. Heckerman, 6 Tex. Civ. App. 304, 25 S. W. 166. In that case it would appear that the state of Texas patented a section of land to Fannie P. Heckerman September 18, 1883, that she died in 1884, leaving one child, Fannie A. Heckerman, and that at the time of her death she was a nonresident of the state. Powell & Gage, a partnership firm composed of A. M. Powell and E. L. Gage, brought suit against Fannie P. Heckerman and her husband in 1885 (Fannie P. Heckerman then being dead), and, procuring service by publication, recovered a judgment for debt and foreclosing a lien upon said section of land, and under execution sale was made to E. M. Powell. Thereafter, in the year 1886, Fannie A. Heckerman, by Ed P. Heckerman, her father and next friend, filed suit against the said Powell & Gage praying on final hearing for a review of said cause, and that said judgment be set aside, and that the cloud cast upon the title because of said execution sale be removed, and that they be quieted in their title as against the same. In the trial of that suit the court entered judgment holding the previous judgment void and

setting it aside, but, instead of following the prayer of the petition, decreed that Fannie A. Heckerman and her father recover a personal money judgment against the defendants, Powell & Gage, for $125, the proceeds of the sale made by the execution in the former suit, and that Powell & Gage recover against her and her father the sum of $260, the original debt owing by her mother. Both parties excepted to this judgment and gave notice of appeal, but none was ever perfected, and the judgment became final. It is to be noted that the suit in this case was filed against Powell & Gage two years after E. M. Powell had sold the land in question to the Western Land & Live Stock Association. Thereafter Fannie A. Heckerman, through her father and next friend, filed another suit in trespass to try title against the Western Land & Live Stock Association to recover the same land. The court, speaking of the former judgment of the court in the case of Powell et al. v. Heckerman et al., as res adjudicata of the issues in the present case, said:

"Having recovered the proceeds of the sale, she should not also be allowed to recover the land, unless the fact that the Western Land & Live Stock Company, to which Powell had previously conveyed the land by deed of general warranty, was not made a party to that suit, prevents the judgment therein from operating in its favor. The effect of a judgment in such a case was to some extent considered by us, but not passed upon, in the case of Vaughan v. Foster (decided January 24, 1894, but not reported by order of the court). We there recognize the doctrine that ordinarily an estoppel, to be effectual, must be mutual. The live stock company, not having been made a party to that suit, could not have been bound by the judgment therein, and it would seem to result that it should not, for that reason, derive any benefit by way of an estoppel therefrom."

The court, however, in that case, upon the authority of Kramer v. Breedlove, held that the judgment in such a case inured to the benefit of the grantee in a deed with general warranty made prior to the suit and recovery by the grantor, and allowed such judgment as res adjudicata of the claims of Fannie Heckerman in said latter suit. Unless this case can be distinguished from the instant case upon the grounds that it was a personal money judgment rendered against Powell in the former litigation between Powell and Heckerman, and for that reason Heckerman could not recover another judgment different in kind and character, decreeing to her the recovery of the land, and thus have two judgments on the same subject-matter, in her favor, we cannot follow it. If the intention of said case is to hold that a judgment inures to the benefit of a grantee in a deed under general warranty made and delivered prior to the suit and recovery by the grantor, it is out of harmony with the general doctrine on that subject, and establishes a doctrine not sanctioned in principle or authority.

[10] It is not necessary, under the plea of not guilty in an action of trespass to try title, to plead estoppel before it can be urged as a defense. Hoodless v. Winter, 80 Tex. 638, 16 S. W. 427; Scarbrough v. Alcorn, 74 Tex. 358, 12 S. W. 72; Eddie v. Tinnin, 26 S. W. 732. Therefore appellant's attack on the federal court judgment upon the theory that it was not pleaded, and therefore could not be used as an estoppel, is not well taken.

[11] On the 5th day of December, 1914, it would appear that the Texas Pine Land Association, through its two trustees, made a second deed to the league of land in controversy to the Houston Oil Company. Why the Houston Oil Company sought this deed is not made clear by the record, unless it was done under the belief that the Texas Pine Land Association had acquired some sort of a title or interest under the federal suit which did not pass under the former deed. Not having any interest in the subject-matter litigated in the federal court, as hereinbefore determined, the Texas Pine Land Association acquired nothing under that judgment, and therefore had nothing to convey under the execution of the latter deed. Even if it be conceded that the judgment in the federal court vested the Texas Pine Land Association with the estate and interest of the Beresfords by reason of the judgment, certainly such interest inured to the benefit of the Houston Oil Company under the deed of 1901. In our opinion, the second deed could not add anything to the doctrine of estoppel in favor of the Houston Oil Company. The doctrine of estoppel is an incident to some right or title, and had no independent existence of such right or title. We see nothing, therefore, in the execution of the second deed that can add anything to said doctrine.

Appellant's ninth and tenth assignments of error are in part sustained, for the reasons herein stated.

Coming to the second material question in the case, we proceed to determine whether or not the record requires a submission to the jury of the question of the forgery of the deed from Montgomery to Moon.

[12] At the outset appellees object to our consideration of appellant's assignment of error No. 1, which assignment is as follows:

"The court erred in not directing a verdict for the defendant Village Mills Company, for this: The defendant established a good and perfect title from the sovereignty of the soil to the land in controversy in this suit, and plaintiff has wholly failed to establish title: (a) By the purported deed from D. C. Montgomery to Samuel Moore, the execution of which is not proved."

The objection to the consideration of said assignment, among other things, is as follows:

"That the trial court was not requested to direct a verdict for the defendant Village Mills Company, but, on the contrary, the defendant requested the trial court in writing to submit this cause to the jury on special issues."

It does not appear from the record that the trial court was requested to direct a verdict for the appellant, and therefore, in that state of the case, appellant is in no position to predicate error in that respect.

[13] The second assignment of error, however, presents clearly the question of forgery of the purported deed from D. C. Montgomery to Samuel Moore, of date June 5, 1838. This deed appears to have been witnessed by Thomas Moore and William Cartwright, and to have been acknowledged before G. V. Lusk, chief justice and ex officio notary public in and for Shelby county, Republic of Texas, on June 10, 1838, and recorded in Menard county on March 22, 1841, and recorded in Hardin county on February 28, 1859.

[14] The filing of the affidavit of forgery put the burden of proving the execution of this deed upon the appellees, and it becomes necessary to inquire whether a sufficient predicate was laid authorizing the introduction of such a conveyance, and especially a certified copy thereof.

[15] Enc. Evidence, pp. 206, 207, states the general rule covering the introduction of secondary evidence of deeds as follows:

"Before secondary evidence of the contents of an alleged deed is competent, its existence as a deed must be sufficiently proved and its loss or absence satisfactorily accounted for. And the logical and proper preliminary proof is to show: First, its existence; second, its valid execution; third, its delivery and acceptance; and, fourth, to account for its nonproduction, after which evidence of its contents is proper."

The appellees filed their affidavit of diligent search for the original deed, and that the same was lost, and supported this affidavit by evidence which we think sufficient to meet the requisite of the rule accounting for its nonproduction.

[16] On the issue of the existence of the deed the appellees offered in evidence an original receipt from the clerk of the county court of Hardin county, Tex., reading as follows:

"State of Texas, County of Hardin.

"Received of Thomas S. Word, of the county of Anderson, the following deeds for record in this county, and which I, as the clerk of the county court of said county of Hardin, promise to record as the law directs, to wit: (1) A deed made by D. C. Montgomery to Samuel Moore, of date 5th June, 1838, for the league of land granted to the said Montgomery on the west bank of the Neches river on or about the 29th of August, 1835, which deed is witnessed by Thomas Moore and W. Cartwright, and is duly acknowledged before G. V. Lusk, chief justice of the county of Shelby and ex officio notary public, on the 10th of June, 1838, and duly recorded in Menard county by James B. Arnette, clerk of the county court, on the 22d day of March, 1841. [Here follows description of two other deeds to O. C. Nelson and S. P. Bankston.]

"[Signed] W. F. Cotton, Clk. C. C.,
        by His Wife, M. A. Cotton.

"This 11½ o'clock a. m. February 14, 1859."

Indorsed on back:

"W. F. Cotton receipt for (1) D. C. Montgomery; (2) O. C. Nelson; (3) S. B. Bankston deed."

The fact that the deed was registered in Menard county in 1841 is another circumstance of its existence. It seems to us these two circumstances meet the second requisite of the rule.

[17, 18] The fact that the deed was recorded raises a presumption of its delivery. Holmes v. Coryell, 58 Tex. 688. And evidence of the claim under it and subsequent transfers of title emanating from said deed are circumstances showing its acceptance. This meets the third requisite of the rule. There is much evidence pro and con on the execution of the instrument. One of the circumstances relied upon by appellant to cast suspicion upon the deed in question as a forgery is a contention by it that at the time the acknowledgment of said deed was taken by G. V. Lusk as chief justice and ex officio notary public of Shelby county he did not, in fact, hold such office; that he was only chief justice of Shelby county from February 4, 1839, to December 15, 1840, and in support of this contention they introduce a certificate from the secretary of state that:

"I do hereby certify that the records of this department show that George V. Lusk was appointed chief justice in and for Shelby county, Republic of Texas, on February 4, 1839, and that his term expired on the 15th of December, 1840."

This certificate does not undertake to say that Mr. Lusk was not chief justice of Shelby county at the time and prior to his appointment on February 4, 1839.

The Journal of the House of Representatives of the Republic of Texas, First Congress, First Session, page 283, shows that on December 16, 1836, the two houses, being in joint session, proceeded to the election of chief justices, and that:

"Mr. Pennington nominated Mr. George V. Lusk for the county of Shelby, and, there being no other nominations, the Speaker announced Mr. Lusk duly elected chief justice of county of Shelby."

"The Secret Journal of the Senate" shows that on December 20, 1836, President Houston nominated, and the Senate confirmed, Mr. George Lusk as chief justice of Shelby county. As a matter of historical interest, it will be remembered that President Houston claimed the right to nominate the chief justices, but Congress claimed the right to elect them. Both, however, seem to have acted in the election and appointment of Mr. Lusk. It appears from the records of the proceedings of the First Congress that the office of chief justice of a county was created by act of December 20, 1836, and providing for a tenure of four years. 1 Gammell's Early Laws, p. 1208. Under the terms of that act, it was provided:

"For the creation of county courts to be composed of one chief justice, who shall be elected by joint ballot of both houses of Congress." Id. 1208.

Under section 34 of that act the chief justices of the several county courts were constituted ex officio notaries public, and author-

ized to take proof or acknowledgments. Volume 1, p. 1215, Gammell's Early Laws.

Even though the record shows there may have been some irregularity in the election of Mr. Lusk, still it can hardly be urged that that fact cast any suspicion upon the deed in question or in the remotest degree could be used as a circumstance to prove forgery of that instrument. In this connection it is further contended that, if G. V. Lusk did take the acknowledgment of the deed, he was not authorized at that time to do so, that "the chief justice was first authorized to take the personal acknowledgment of the grantor to a deed on January 19, 1839, and that prior to that time the personal acknowledgment of a grantor could only be taken by the county clerk of the county where the deed was to be recorded." Paschal's Digest, arts. 4973, 4974.

Mr. Houk, in his work on Written Instruments of Texas (section 852), referring to the power of chief justices to take acknowledgments, says:

"From the following statutes it appears that from December 20, 1836, to March 17, 1841, chief justices were authorized to take any and all acknowledgments of instruments to be recorded anywhere."

However, even conceding that there may have been some technical question under the laws of that date as to the power of chief justices to take acknowledgments, still Act Feb. 5, 1841, § 20, Congress of the Republic, cured this defect; the same being passed for the specific purpose of validating such acknowledgments. In construing these statutes, our Supreme Court has specifically held that an instrument acknowledged at the time and in the manner of the one in the instant case was sufficiently authenticated to admit it to record. Butler v. Dunagan, 19 Tex. 565; Waters v. Spoffard, 58 Tex. 115; Wilson v. Simpson, 68 Tex. 313, 4 S. W. 839. There is no merit in appellant's contention upon these specific points.

There are a number of other circumstances in the record, conflicting and otherwise, introduced by both appellant and appellees, affecting the valid execution of said deed, and it would serve no purpose to burden this opinion with any detailed reference to such testimony.

[19] It may be conceded that the age of the deed, 77 years, the registration of same, and the certified copy of the original recorded in Menard county in 1841, and in Hardin county in 1859, taken in connection with the long and continuous assertion of claim thereunder, and the presumption which is indulged in favor of innocence of crime, were sufficient to meet and overcome the burden of proving the genuineness of said deed cast upon the appellees by the affidavit of forgery filed against it by the appellant, and that it devolved upon the appellant to meet this prima facie proof of the validity of said deed. Holmes v. Coryell, 58 Tex. 680; Word v.

Houston Oil Co., 144 S. W. 334. The record shows that appellant sought to do this by introducing circumstances hereinbefore generally referred to, and we think them sufficient to raise a fact question for the jury, and believe that the question of the validity of such deed should have been submitted to the jury under appropriate instructions.

[20] There are many questions raised by appellant affecting appellee's claim to the land under the statutes of limitation, and to consider them in detail at this time would unduly prolong this opinion. A careful examination of the evidence, however, fully convinces us that title under such statutes was not established by the uncontroverted testimony in the record in favor of appellee and those under whom it claims as would sustain a peremptory instruction. There are many controverted issues of fact as to whether the tenants of the appellee and those under whom it claims exercised and claimed the right of their alleged possession for the continuous periods required by the statutes, whether such claims were made for their lessors or for themselves during all of such time, whether the possession extended to the entire league, or only to segregated parts, and whether the possession was of such a nature, under all the facts and circumstances, as to give notice of its adverse and hostile character. The evidence, we think, presents questions of fact to be determined by the jury under appropriate instructions. If appellant desired the case submitted upon special issues, it has the right, under the statute, making a seasonable request therefor, to have the jury render its verdict in that way, and, of course, the court will submit the cause as requested, and under such instructions as he thinks should be given to properly present the issues involved.

All other assignments of error, except the third, which is not considered for the reason that it is based upon a failure to give a peremptory instruction in favor of the defendant, when no such instruction was requested of the court, and which are not otherwise disposed of by the disposition made of this case, are overruled.

This case will therefore be reversed and remanded; and it is so ordered.

### On Motion for Rehearing.

The appellees have filed in this cause a motion for rehearing, which we have carefully considered in deference to the learning of counsel, and the earnestness with which the motion is urged. They insist that this honorable court erred when it said (referring to the federal court suit) "that, in so far as the title to the land was concerned, the Texas Pine Land Association and its trustees had no interest," for the reasons: (1) The plaintiffs in that suit expressly alleged that the Texas Pine Land Association had taken possession of the land in controversy on January 1, 1900, and during such time they had

cut and removed over $20,000 worth of timber, for which damages were sought, as well as for the rental value of the land, and (2) that the deed of July 31, 1901, from the trustees of the Texas Pine Land Association to the Houston Oil Company of Texas conveying the land in controversy was a special war-ranty deed, and that said deed contained a provision as follows:

"The premises are conveyed subject to a mort-gage or a deed of trust dated November 1, 1894, made to the American Loan & Trust Company at Boston, to secure an issue of bonds of said Texas Pine Land Association, amounting to $50,000, of which bonds $39,000 are still un-paid."

Under the first proposition, it is urged:

"That the Texas Pine Land Association was therefore, not only a proper party to the suit, but it was necessary, in order for the Beresfords, as plaintiffs, to recover therein for the timber cut, and possession held by such defendants, that such plaintiffs show their title to the land, and, conversely, it was a perfect defense for the Tex-as Pine Land Association to show that they were the owners of such land, or had title there-to when the timber was cut prior to the filing of said suit."

It is to be observed that the federal suit contained two distinct causes of action in separate counts, one to obtain the title and possession of land in the statutory form of trespass to try title, and the other to obtain a personal money judgment for tort, to wit, the wrongful cutting and conversion of the timber, which, under the statute, could be included in the action of trespass to try ti-tle. In the first cause of action the title and possession of the land was directly and pri-marily involved. To render an effective judg-ment thereon, as against the real and true owners of the title, at the time of filing the suit, such owners certainly should have been made parties to the suit litigating that ti-tle. A judgment against a prior vendor or a third person, erroneously asserted in the pleadings and sued as the true owner, would certainly not affect in any manner the title of the true owners. It is this sort of a judgment that the appellees are relying upon as an estoppel.

As heretofore said, the Texas Pine Land Association had neither the possession nor the title to the land in controversy at the time the suit in the federal court was filed against it and its trustees. That suit was filed November 1, 1901. The deed from the Texas Pine Land Association to the appellee the Houston Oil Company of Texas was ex-ecuted on July 31, 1901, and filed for record in Hardin county, Tex., on August 17, 1901, fully 2½ months before the federal court suit was filed. Suppose the Texas Pine Land Association had failed or neglected to make a defense to this suit, and judgment by de-fault had been entered against it simply for the title and possession of the land, without any judgment on the claim for damages; can it be maintained by any authority that the Houston Oil Company of Texas, a prior vendee of the Texas Pine Land Association,

would have been bound by that judgment? The question is so contrary to reason and sound principle that a mere statement of it contains its own refutation.

As an abstract proposition, it may be ad-mitted that, in so far as the second cause of action in the federal court suit is concerned —that is, for the wrongful cutting and con-version of timber from the date of the alleg-ed wrongful entry, January 1, 1900, up to the 31st day of July, 1901—the Texas Pine Land Association, being the one alleged to have committed the wrong, and from whom dam-ages therefor were claimed, was a necessary party to the suit; and in determining the is-sue of damages for cutting and removing the timber it may be further conceded that the title to the land, as between the two con-tending parties to that suit, was incidentally in issue. If, as between them, the court should determine that the Texas Pine Land Association had the title to the lands when the timber was cut and removed, even though that determination is based upon a mistaken assertion of title in plaintiff's pleadings, as being in the defendant the Texas Pine Land Association continuously from January 1, 1900, up to the filing of the suit, that judg-ment did not and could not in any manner affect the true owner of the title to said land; but, as a matter of fact, no judgment was entered on the second cause of action stated in the petition. Under the disposition made of the first cause, no such judgment was necessary. The determination of the first cause of action in that suit in favor of the defendants ipso facto eliminated the second cause of action from the litigation. The judgment entered was one primarily af-fecting the title to the land, and, as here-inbefore stated, that judgment in no manner was binding upon Houston Oil Company, the appellee in this suit.

[21] Under the second proposition, it is contended that in Revised Statutes, art. 7735, it is provided:

"When a party is sued for lands, the real own-er or warrantor may make himself, or * * * be made, a party defendant in the suit, and shall be entitled to make such defense as if he had been the original defendant in the action"

—and that this statute was enacted to en-able a warrantor to come into a suit which had been properly instituted against those who really owned the title to the land, who in the event of a judgment would be bound thereby, to assist or take over the defense of the suit, so as to escape liability on the warranty. This contention may be conceded, but there is nothing in this statute which would modify or dispense with the rule that requires parties really owning the title to the land to be affected by the judgment dis-posing of the title to be made parties to the suit.

The language used in the main opinion, and about which complaint is made in the motion for rehearing, must be construed in

the light of what is here said and in the application of the rule of estoppel as it applies to judgments. The reasoning of counsel upon the contentions herein contained is academic, and does not apply to the facts and questions as we find them presented for our determination. It is also earnestly insisted that we erred in holding that there were facts and circumstances shown by the record which raised an issue for the jury on the question of forgery of the deed from Montgomery to Samuel Moore of date June 5, 1838, and we are asked to set out the proof, whether circumstantial or otherwise, which we consider sufficient to require the question of forgery of said deed to be submitted to the jury, and in compliance with that request we enumerate the following circumstances:

In this case the record shows the execution of two deeds out of the original grantee, D. C. Montgomery, one of which was to Arthur Henry, of date January 27, 1836. In connection with this deed it is shown that Arthur Henry paid the government dues on this land, and conveyed it to Beresford in 1845, and delivered with the deed the original testimonio and other original documents in the chain of title. The record does not show any suspicious circumstances surrounding the execution of this deed. There are many acts reflected in the record showing a continuous assertion of claim and title to the land by the Beresfords under the chain of title emanating through this deed.

The second deed purports to have been executed by D. C. Montgomery to Samuel Moore in 1838. Samuel Moore lived in South Carolina, and not in Texas, and he was a relative of David Brown. David Brown is shown to have lived about the date of the execution of the latter deed in San Augustine county; that he came originally from South Carolina; that his real name was Robert Stephens, which he changed to David Brown when he came to Texas; that he was a surveyor, and trafficked in land titles; that his character was bad; and that he was commonly known as a "land shark or a forger of land titles." No claim to this land or any act of ownership on the part of Samuel Moore is reflected in the record, except as hereinafter stated. The land was never assessed by Moore for taxes. The only evidence tending to reflect an assertion of claim by Moore to the land was the execution by him of a power of attorney to Reuben L. Stevens "to convey such lands as may have been granted to him in the state of Texas, provided that all of the proceeds thereof be appropriated by our said attorney to the use and benefit of Mary Brown, daughter of David Brown, both of the state of Texas." Reuben L. Stevens was a brother of David Brown, and resided in the state of South Carolina, and, as recited in the power of attorney, Mary Brown was the daughter of David Brown, and lived in Texas. Under this power of attorney R. L. Stevens conveyed

the land to Mary E. Brown on August 10, 1849. This deed was filed for record October 7, 1854. Samuel Moore subsequently, to wit, on the ———— day of ————, 1849, made a quitclaim deed to the same land to Mary E. Brown. These circumstances are sufficient to raise a strong inference that David Brown was the real owner of the league in question.

The other deeds introduced in evidence (one of which has been judicially determined to have been a forgery, the deed from Samuel Moore to Hurd, of date 20th day of January, 1838, 144 S. W. 334), and their manner and form of execution; their peculiar verbiage; the similarity of their dates; the way in which they were filed for record, all of them appearing to have been filed on the 22d and 23d day of March, 1841, all of the acknowledgments appearing to have been taken before the same notary; the lapse of time appearing between the dates of their execution and the alleged dates of their acknowledgment, all of them appearing to have been executed in Shelby county—all of these matters were circumstances which could be considered by the jury as reflecting the method, manner, and system of David Brown in his efforts to acquire the beneficial interest in the lands in which he was trafficking, and to cover over such intent and purpose. The taking of conveyances in the names of his brother and other relatives, who subsequently gave powers of attorney or quitclaimed the title back to Mary E. Brown, his daughter; the recitation contained in some of the conveyances found in the record that David Brown was, in fact, the beneficiary and owner, etc.—these matters reflect more or less light upon the question of forgery of the deed in the instant case. They show a studied, roundabout, and indirect way of acquiring titles, which might be considered by the jury as the method a "forger and land shark" would naturally select to cover up the tracks of his unlawful acquisition. The peculiar verbiage of all of the deeds in evidence might have logically been considered by the jury as leading to the conclusion that all of said deeds were written by one and the same hand. The unusual verbiage of said deeds is an extraordinary feature of them. It fixes to each of such conveyances a prominent characteristic, which links them together, and stamps them with features as pronounced and distinctive as that which heredity gives in family relationships.

It is also to be noted from the evidence that, when the deed from Montgomery to Moore was recorded in Menard county in 1842, the certificate of acknowledgment was unsigned by Lusk, and bore no seal. When recorded in Hardin county in 1859, the certificate bore the signature of G. Lusk, with the seal impressed. This is a circumstance of

more or less cogency bearing upon the genuineness of the instrument.

It is earnestly urged that our decision in this case on the question of forgery is directly in conflict with the case of Hanks v. Houston Oil Co., 173 S. W. 635, in which case it is claimed the court held similar facts did not raise the issue of forgery sufficient to cause the trial court to submit that issue to the jury. The official report of the Hanks Case does not set out the evidence which the court considered "negative, disjointed circumstances not inconsistent with the genuineness of the deed." However, we have been furnished by counsel with a copy of the briefs in said cause, which specifically set out the circumstances, supported by references to the record, which were relied on in said cause as raising the issue of forgery. We note the following distinction between the facts in the Hanks Case and in the instant case: In the Hanks Case there was but one deed out of the original grantee, A. W. Smith, that deed being to John R. Stevens, under whom the appellees claimed, and against which an affidavit of forgery had been filed. The league of land was granted to Smith in 1835. The evidence showed that Smith lived in the neighborhood of this land for a great many years after the execution of the deed in question; yet up to the time the suit was filed in 1910, a period of 75 years, neither the original owner of the land, Smith, nor any of his heirs, made any claim to the land, by conveyances or otherwise. In the instant case the record is replete with positive, distinct, and continuous assertions of title to the land in controversy by Beresford and his heirs from and under the first deed executed by Montgomery to Arthur Henry down to the present time. Another potent fact which does not exist in the Hanks Case is that in the instant case two deeds appear in the record out of the original grantee, under the first one of which appellant claims. In the Hanks Case there was only one deed out of the original grantee. In the instant case the probability of forgery of the second deed is fortified with the presumption, which the court always indulges, that people are usually honest, and that a grantor, having already disposed of his title, would not defraud nor attempt to defraud the purchaser by the execution of a second deed to the same land. In the Hanks Case there were no circumstances casting suspicion on the deed out of the original grantor by reason of a variance in the signature in the notary's certificate of the acknowledgment, as was shown in the two registrations of the second deed in the instant case. While a good portion of the facts and circumstances in the two cases are similar, still the matters of difference hereinabove set out are sufficient to manifest a marked contrast in the weight and force of the evidence supporting the issue of forgery.

We are also asked to point out the testimony which, in our judgment, raised the issue of limitation, which should have been submitted to the jury, and in compliance with that request we have again examined more carefully this subject. In a review of the evidence on this issue it may be well to incidentally note, as we proceed, in the compliance with the request aforesaid, to state some of the principles applicable to the facts in the instant case, as we understand them, underlying the acquisitions of land by a claim of adverse possession.

[22] The burden of proving adverse possession is in all cases upon the one who sets it up, and who claims under it. He must show every element necessary to perfection of such title. Cunningham v. Frandtzen, 26 Tex. 35; Whitehead v. Foley, 26 Tex. 289; Smith v. Power, 23 Tex. 30; Mitchell v. Burdett, 22 Tex. 633; Sterrett v. Middleegg, 44 Tex. 536; Williamson v. Simpson, 16 Tex. 445; Dunn v. Taylor, 102 Tex. 80, 113 S. W. 265; White v. Eavenson, 46 Tex. Civ. App. 158, 101 S. W. 1029; Rhodes v. Whitehead, 27 Tex. 304, 84 Am. Dec. 631.

[23] The evidence establishing adverse possession ought not to be vague and uncertain. Taylor v. Doom, 43 Tex. Civ. App. 59, 95 S. W. 4.

An examination of the record in the instant case discloses the execution of several tenancy contracts between the Houston Oil Company and its predecessors in title with various persons, under which tenancy contracts appellee is now asserting title by limitation. We may say at the outset that there is no such conclusive evidence in the record as would show a privity of possession and continuity of claim under and by virtue of any of the lease contracts executed prior to the Cockerham lease as would justify a peremptory instruction to the jury to find for the appellee on the issue of limitation. The appellee urges upon us with great force and learning that it has perfected title to the land in controversy by virtue of the five-year statute of limitations, under a lease executed by it with H. J. Cockerham and wife, of date June 6, 1906, and, as we shall have occasion to further consider this instrument, we set it out in full:

"The State of Texas, County of Hardin.

"Know all men by these presents that we, H. J. Cockerham and M. A. Cockerham, wife of the said H. J. Cockerham, of the county of Hardin, state aforesaid, in consideration that the Houston Oil Company of Texas, a corporation duly incorporated and existing under and by virtue of the laws of the state of Texas, with its principal office in the city of Houston, Harris county, Tex., now owning in fee simple the following described tract or parcel of land, to wit: All of the D. C. Montgomery league of land lying and being situated in Hardin county, Tex.—and is desirous of placing a tenant upon said land for the purpose of protecting the same and having it guarded against trespassers and preventing any and all persons from cutting and removing the timber now situated, standing, and growing thereupon, and for and in consideration that we are to use and enjoy until the 1st day of January, A. D. 1931, the improvements situated

thereon for farming use only, free of charge or rental, we, H. J. Cockerham and M. A. Cockerham, husband and wife as aforesaid, do hereby acknowledge our tenancy under the above-named company and obligate and bind ourselves to use said land for farming purposes only until the 1st day of January, 1931, and that we will not cut nor destroy any timber thereupon, and as agents and tenants as aforesaid will prevent any and all trespasses from others, of whatsoever nature, upon said land and timber, and at the expiration of the above-specified time, to wit, January 1, 1931, we will vacate, deliver up, and turn over the above-described premises unto the said company, their successors or assigns, in as good and perfect condition as they are now, free from all charges, costs, expenses, or delay to it, the said company, whatsoever.

"In testimony whereof we hereunto set our hands this 6th day of June, A. D. 1906.

　　　　　"[Signed] H. J. Cockerham
　　　　　　　　　　　　　her
　　　　　"M. A. X Cockerham.
　　　　　　　　　mark

"Duly acknowledged by H. J. Cockerham and his wife, M. A. Cockerham, before J. E. Crawford, notary public Hardin county, Tex., on June 6, 1906.

"Filed for record June 9, 1906. at 11 o'clock a. m., and duly recorded June 26, 1906. at 11 o'clock a. m. in Deed Records of Hardin County, Tex., at Book Vol. 40, on pages 156 and 157, by F. W. Tebbs, clerk of the county court of said Hardin county, Tex."

The five-year statute of limitations prescribes the following requisites: (1) Peaceable and adverse possession; (2) cultivation, use, and enjoyment of the land in controversy; (3) the payment of taxes thereon; (4) the claim to the land must be under a deed or deeds duly registered; (5) this statute does not apply to any one in possession of land who, in the absence of the article, would deraign possession of title through a forged deed, or to one claiming under a forged deed. R. S. art. 5674.

The decisions and text-books are unanimous in declaring that in determining what constitutes adverse possession that such possession must be: First; actual; second, visible; third, exclusive; fourth, hostile; and, fifth, it must be continued under a claim of right during the time necessary to create the bar. 1 Cyc. 983 et seq.; Portis v. Hill, 3 Tex. 273; Mhoon v. Cain, 77 Tex. 316, 14 S. W. 24; Michie's Digest, vol. 11, p. 907, for collation of all of the Texas authorities.

The testimony shows that Cockerham had an actual possession of a small portion of the land in controversy, so we will proceed to consider whether his holding was in compliance with the other requisites of "adverse possession," and we inquire, therefore, into the "visible" feature of his possession.

[24, 25] "Adverse possession" must be open and notorious possession. In order to make a good claim by adverse holding, the true owner must have actual knowledge of the hostile claim, or the possession must be so open, visible, and notorious as to raise the presumption of notice to the world that the rights of the true owner are invaded intentionally, and with the purpose to assert claim of title adversely to him, so patent that

the owner could not be deceived in the exercise of ordinary prudence over the true situation. The general rule deducible from the various authorities and text-books on the subject is that in determining whether possession is open, visible, and notorious, so as to charge the owner with notice of an adverse claim, the nature, situation, and use of the property are to be considered, as well as the quantity or proportion of the land actually occupied.

It is therefore difficult or impossible to specify the acts which would under any and all circumstances and conditions constitute open and visible possession. The authorities seem generally to hold that it is sufficient if the land is appropriated in such a manner as to apprise the community that it is in the possession and enjoyment of the party claiming it. And that openness and exclusiveness are shown by such acts will ordinarily be presumed by the owner in appropriating the land, and its avails to his own use, and preventing, so far as practicable, all others from using it. 1 Cyc. 999; Texas, etc., Ry. Co. v. Maynard, 51 S. W. 255; McCarty v. Johnson, 20 Tex. Civ. App. 184, 49 S. W. 1098; Chance v. Branch, 58 Tex. 490; Whitehead v. Foley, 28 Tex. 268; Holland v. Nance, 102 Tex. 177, 114 S. W. 346; Richards v. Smith, 67 Tex. 610, 4 S. W. 571; Bracken v. Jones, 63 Tex. 184; Mhoon v. Cain, 77 Tex. 316, 14 S. W. 24; Craver v. Ragon, 110 S. W. 489; Satterwhite v. Rosser, 61 Tex. 166–170; Fuentes v. McDonald, 85 Tex. 132, 20 S. W. 43; Nona Mills Co. v. Wright, 101 Tex. 14, 102 S. W. 1118.

Keeping in mind these rules, let us turn now to the testimony of Cockerham, who was in possession of the land under the above lease, holding for the appellees:

"I lived in Hardin county on the D. C. Montgomery league, an the east part of it. I have lived there something over twelve years. Now, there has been introduced in evidence a lease of mine from Houston Oil Company of Texas, dated 6th of June, 1906. I made that lease. I was living on the land at the time. When I made that lease I was living on the land at the time. I had been living there, and that has been my home and the home of my family. During that time and since the time I leased the land I have been living right there on that same piece of land all the time. * * * I have been cultivating some of the land. I cleared up about six acres of it and have it in cultivation. I have cultivated it every year, and am still living on it. I am cultivating some land this year. * * * You ask me what I have got there in the way of a house, improvements, and so, and I say that I have a very good double house, one hewed log house, and the other weatherboarded; made my own boards for it. I have got the following houses; I have got a smokehouse, henhouse, stable, crib, and cow shed. * * * I leased it for twenty-five years. I had been there going on three years before I signed that lease. * * * This arrangement I made with the Houston Oil Company was the first arrangement I made just a little while before I signed the lease was the first arrangement I made with anybody. I had not been holding it for anybody before that at all, only I aimed to hold it for myself. The way I got to be on it

myself was I thought it was lost land, and I found it. I thought it was lost land. I thought I would try to get me a home on it, like the rest of them was trying to do. A whole lot of them does get homes that way. Well, it is going on three years that I had been there when I signed this lease—between two and three years."

On cross-examination he said:

"The improvements that I have got there now were not there at the time. All there now I put there. There was nothing but the briars, sweet gum poles, around it. As to whether it is a fact I was living down there first, well, I was fishing and hunting. That is what I was there for. I went there to make me a home, and didn't have but little means, and I had to do something to get me something to eat. Ever since that time hunting and fishing has been my occupation; not altogether, because I have been cultivating this land, trying to make me a living out of that, because I was starving to death. That is not the same house that I had when Mr. McClelland came there, I built a house since. I built the first house there when I first moved on it; nothing but an old pine pole pen, you might say; one of these 16x18 sheets put over it, wagon sheet, one of those uprights that goes over those big tents, built up to the wall and strapped over to it, the pine poles. That is the way I was living when I signed that lease. It was about a year after I signed that lease before I built my addition to that. Yes, sir; about a year after I signed the lease. You ask me to try and get accurately just when it was, and I say it was not over a year, I think. I think I commenced it just about a year, because I commenced the next spring hewing my logs. The springtime I cut the logs and let them dry so I could handle them. I got out my logs and let them dry out in the next spring or summer. A little over a year after I signed the lease, and before the winter came, I commenced constructing my house. I got it finished before Christmas some time in November I moved in. * * * No; I built my house along in November, a year from the time I signed the contract, and that would be in November, 1907. * * * I will now describe to the jury how big a house that is. It is about 14x16 feet just one room I built at that time. * * * I done nothing out of doors only to try to clear a little land along at spare times, I done that in the following year. The year after I finished my house I cleared some land, cleared some more land. I had just a garden spot about one acre at that time, before I commenced clearing additional land. You ask me how much is an acre, and I say that they tell me it is 70 yards square. Now as to whether I tell the jury that I had 70 yards, well, I tell them it was not exactly in a square, because I had built it of poles, and it was in a circle. Of that inclosure I was cultivating all of it inside the garden; me and my woman was eating the vegetables. Mr. Dies sent me some garden seed, and they made pretty good stuff. I did not eat it up one Sunday for dinner. We did not eat it, it took us two or three Sundays. I did not have anything but that pole tent until I built my hewed log house in the fall of 1907. That's all I had outside of my stable for my pony. That is not the same stable I had when I first went there nor the one I got now. You say that you are trying to find out what I had there when I built that hewed log house, and I say just that old house we were living in and the stable for my pony, and this pole garden is all I had. I was making my living hunting and fishing, and then it was over a year after I built my hewed log cabin or house. I extended my inclosure for my garden or field. Yes, sir; about two years after that, something like two years, and I extended my inclosure and took in a little more land. You say that

would be then along in the fall of 1909 or 1910, and ask me if that is about right, and I say about 1908, I think it is, I got all the land cleared. When I cleared my garden spot about the house, I added a little bit to it every year until I got about 2 acres. This way I did not make much addition to my garden for two years after I built my house, and I say something like 2 acres; yes, sir. As I extended my inclosure I did not build it up with poles, I built it with pickets. I have a good picket fence there now. I put my picket fence up two years after I put up the first house, and, as I say, I kept adding a little more to it making it bigger. During that time my principal was fishing and hunting. I simply had a garden there as an incident. That was just an incident of my profession of hunting and fishing. That is just what it was for. I made my living there. I couldn't eat fish without some vegetables, not much without some bread. I did not sell much vegetables for a right smart while. The first vegetables I sold was in 1909. I sold to Mr. Dick Griffin at Collier's store. You ask me how many dollars worth that was, and I say a small patch of onions the first year made $22 and something. The next year it made $31 and something, and the last year it was $36.50. This year I haven't got through with them; I don't know what I will get out of it. It was the last three years crops I spoke of that I sold. You ask me what I would say was the value of the improvements there, and I say to get right down to the value it is mighty hard to get at it. To go to the woods and cut and wood and get the land in cultivation if it was mine and I had a deed to it, $1,000 would not move it. I cannot tell you neither what it cost me to build the house, because I done it piecemeal, hour or two at a time. The most of my enlargements of my patch has not been in the last three years. It has been from the time I first built my picket fence, and each year I added to it. You say I did not build my picket fence for two years after I built my house, and I say I added to it each year since that time. If I built my house in the fall of 1907, two years after that would be the fall of 1909, that I first commenced to enlarge my garden, as near as I can recollect. You say that I never did market any of that stuff until the last three years, when I commenced that onion business, and I say that onion business is about all I sold except a sack or two of sweet potatoes. You ask me if I had anything to do with the balance of that league of land except that, and I say why my lease calls for all of it. I used no part of that land except that I got about 3 acres about a quarter of a mile below that on the same league of land south. It is a quarter of a mile south. * * * I got that 3 acres four years. I made four crops on it. It was not some old field that was down there. It was a gum sapling and briar thicket. The pine timber was dead; no merchantable timber on it. I went down there about four years ago and made four crops on it. That does not include this year's crop. Done already made four crops on it. I raised corn, pumpkins, and peas down there, and I fed that to my pony and ducks. I sold a few pumpkins; I sold about 40 pumpkins. The sort of fence that I have got around it is part picket and part of it is this new fence 8 feet long. * * * Now at the time I went there it is a fact that Mr. Mattingly was on this side of where I was living near the Massey Lake. He lived there. He lived there at the time I signed that paper for the Houston Oil Company. He had been living there over two years before that—about two years. He continued to live there as long as I lived there. If he was there as a tenant of the Houston Oil Company I never heard of it. I knew he was claiming contrary to them. He told me. Said he was getting $5 a month

to stay there, and he asked me what the company was giving me, and I told him nothing. * * * What I mean to say when I say I got about 6 acres down there is what I got at the house and what I got down there in that little field; that is what I mean, altogether about 6 acres. I measured the little field there pretty close and found it a fraction over 3 acres. I have measured that at the house, just a rough sketch. It runs from over 2½ acres there now, I think; it is right close to 6 acres, the whole thing. You ask me did I not have over about an acre when they got me to sign that lease, and I say I did not have anything hardly only this little old pole fence, and down until about a year and a half after I built my house. * * * You ask me the question I never used any part of that league of land or anything to do with it except those two pieces, and did I make any other use of it except to live there on it, and I say for my own benefit I did not. I kept people from stealing the timber. Now, as to who it was as was trying to steal the timber, well there was a whole lot of timber there, and they knew I was there, and they would not steal it. Now, as to whether I ever went to anybody and said, 'Here, you must not cut the timber on this land,' well, I went close enough to see that it was going on other tracts of land, and I did not bother them. As to whether I never said a word to anybody about cutting timber on this land, well, it was none of my business. That was all the tract of land I had to watch over. I did not make any use of this land except such as I have described about the house where I lived, and the patch away over there. That is all the use I put the land to in any way, I hunted a whole lot and killed some deer on it, and caught some fish out of the river. Outside of hunting deer and catching fish, I did not have any other use of that land only what I got in cultivation and getting wood or something like that. I know about the Village Mills cutting some timber on the land. I did not go to them and stop them. I went over there to see about it. I heard they were cutting, and I went over there to see about it, and was going to make a report to Mr. McClelland the next day, and I met him on the train, but I never said anything about it. I did not say anything to Mr. Hooks. Now, as to whether I knew the Village Mills Company had built a house on that land and had got a man living on it, well, I never saw it. I heard they had afterwards. I reckon it is right close to two years that it has been there. * * * If I ever reported a man for cutting on the east end of the league, I do not know it. If anybody was cutting there, if I catched them and knowed who they were, I would have reported it."

This is a suit for a league of land, 4,428 acres. This court will take judicial notice of the common fact that the location of this league is in the wooded and forested section of Southeast Texas. An analysis of the evidence shows that the tenant, Cockerham, was a man of little means, really in want, and that he went on this league of land to make a home and do something to get something to eat; that he went there for the purpose of hunting and fishing, and incidentally raised what vegetables he could to fill in. The first house he built on the land he described as "a pine pole pen, you might say; one of those 16x18 sheets put over it, a wagon sheet, one of those uprights that goes over those big tents." A year or so after signing the lease—that is, in the fall of 1907—he built his present house, and thereafter

erected from time to time the other improvements now found on the land. He did nothing in the way of clearing the land until a year or two after he finished the house. He finally at odd times, two years or more after he had built this house, cleared up as much as 3 acres adjacent to the house, and some time thereafter, which time is not specifically stated, he cleared another piece of about 3 acres, a fourth of a mile distant, thus making all told about 6 acres in actual occupation and cultivation at the time of the trial of this suit. During all the time he has resided on the land his principal occupation has been hunting and fishing. In the last three years he raised onion crops and marketed an amount equal to $119.50. There were other adverse claimants on the land, whom he knew and whom he did not in any manner molest, nor, so far as the record shows, report to his lessor. He never at any time made any use of the balance of the land, except hunting and in using what wood he needed. We are not of the opinion, as was the trial court, that this evidence, as a matter of law, established such visible and notorious possession of the entire league as to raise the presumption of notice to the world that the rights of the true owner were invaded intentionally and with the purpose to assert a claim of title adverse to his, nor are we prepared to say that such evidence, as a matter of law, is such a visible appropriation, use, and enjoyment of the land as contemplated by the statute.

[26] A claim under the five-year statute requires color of title, but not in the sense as contemplated under the three-year statute of limitation, and as defined in article 5673, Vernon's Sayles' Civil Statutes. Under the five-year statute it is not necessary that the grantor should have had title to the land in order that the deed given by him may convey color of title. Harris v. Wells, 85 Tex. 312, 20 S. W. 68; McDonough v. Jefferson County, 79 Tex. 539, 15 S. W. 490; Hunton v. Nichols, 55 Tex. 218–230.

[27] The general rule is that, where one enters under color of title into the actual occupancy of a part of the premises described in the instrument giving color of title, his possession is not considered as confined to that part of the premises in his actual occupancy, but he acquires possession of all of the land embraced in the instrument under which he claims. Porter v. Miller, 84 Tex. 204, 19 S. W. 467; Taliaferro v. Butler, 77 Tex. 578, 14 S. W. 191; Porter v. Miller, 76 Tex. 593, 13 S. W. 555, 14 S. W. 334; Evitts v. Roth, 61 Tex. 81; Cantagrel v. Von Lupin, 58 Tex. 570; Texas Land Co. v. Williams, 51 Tex. 51. The reason for the rule is that one in possession, claiming by metes and bounds under a paper title, and openly and notoriously exercising control and dominion over the land described therein, is presumed to be doing so to the extent of his claim. 1 Cyc. 1126.

[28] So it is to be seen that under the general rule, and more particularly under the Texas statute of five years (R. S. 5674), which specifically requires "cultivation, use or enjoyment of the land," there must be evidence of an open and notorious exercise or control or dominion over all of the land in controversy before the benefits of constructive possession under color of title will avail the claimant so as to perfect limitation under that statute. Mere constructive possession of the land to the limits of the bounds described in the instrument· constituting color of title is not sufficient. The adverse nature of the possession and other requisites of the statute must be complied with.

The evidence of Cockerham hereinabove set out does not show, as a matter of law, that he was exercising that control and dominion over the land outside of the boundaries of the 6 acres actually in his possession which conclusively indicates an open, visible, and hostile claim to the entire league; nor was the trial court warranted in assuming as a matter of law that the evidence of Cockerham showed he had made such appropriation of the land, considering its nature and kind, in the matter of his use and enjoyment of it, and utilizing of its avails, as might be expected of a true owner, and which would indicate and bring home to the true owner notice of a purpose and intention on the part of the claimant to hold all of the league adversely. To say the most for it, this evidence could only raise an issue for the jury as to whether or not the acts stated were sufficient to show an adverse claim, and were of such a nature as to put the true owner on notice thereof. Word v. Drouthett, 44 Tex. 370.

[29] There is another serious question in this cause which affects the construction of said lease, and which we have re-examined on our own motion since writing the original opinion. It is earnestly urged that the lease under consideration is restrictive in character, and in support of this contention appellees rely upon the following case: Houston Oil Co. v. Kimball, 114 S. W. 666, affirmed by the Supreme Court in 103 Tex. 94, 122 S. W. 533, 124 S. W. 85. In the Kimball Case it appears that in 1883 John T. Lewis and R. R. Hester were squatters on small pieces of the league. In 1883 Lewis signed a lease in favor of Irvine the owner which reads as follows:

"For and in consideration rent free of the house, fields, and improvements then occupied by him, and in consideration of the right to use timber for firewood and to make repairs, he acknowledged himself the tenant of Irvine, and agreed as such tenant to occupy and hold possession of such league of land."

In the instant case, the lease reads:

"For and in consideration that we are to use and occupy until January 1, 1931, the improvements situated thereon for farm use only, free of charge of rental, * * * do acknowledge our tenancy * * * and obligate and bind ourselves to use said land for farming purposes only, * * * and that we will not cut nor destroy any timber thereon, and will prevent trespassers," etc.

Both leases are similar in the following respects: (1) Both the lessees were squatters on the land before the execution of said leases; (2) both of the tenants were to use and occupy the improvements rent free; (3) both acknowledged tenancy to the alleged owner and agreed to occupy and hold the possession of the entire league; (4) in the first lease no restrictions were placed upon the nature of the use of the improvements, while in the instant case the land could be used "for farming purposes only"; (5) in the first lease the lessee was granted the right to use the timber for firewood and to make repairs, while in the instant case such privilege was not extended to the lessee, unless it be included within the meaning of the term "farming purposes only," and that such privilege is included within the meaning of that term, we have serious doubts.

It is therefore to be seen that upon a careful analysis of the two leases in question the one under consideration in the instant case appears to be more restrictive in its nature than the one which the court was considering in the Kimball Case. Under the most liberal view of the language of the lease in the instant case, Cockerham was not permitted to cut or destroy any timber on the lease for any purpose, and his use of the land was restricted to "farming purposes."

Here is a situation where we are presented with a claim to 4,428 acres, with actual occupancy of only 6 acres, with the use of the entire league, under the tenancy contract, restricted to farming purposes only, in a densely wooded country, with a positive prohibition as to cutting or destroying any timber for any purpose. The logical effect of these restrictions is to absolutely limit the tenant to the use and enjoyment of the 6 acres, for no other part of the land in its natural state, in so far as the record shows, could be utilized generally for farming purposes. Speaking of such restrictive leases in the Kimball Case, 114 S. W. 668, the court said:

"The leases were of restricted parcels. The use essential to title under the statute was restricted to these parcels by the provision in some of the instruments to the effect that the tenant agreed to occupy and hold possession of the league; it was manifestly not intended to lease the whole. Besides, in no instance was there any evidence that any of these tenants ever extended his possession beyond the parcel he was ocupying with his houses, field, or improvements. In the case of Read v. Allen, 63 Tex. 157, it appears that the trial court charged the jury: 'Where one holding a deed to land described by metes and bounds leases a part of said land to a tenant by specific metes and bounds, then the possession of said tenant is only coextensive with the bounds specified in the lease, and not the whole tract.' Speaking of the correctness of this charge, the court said: 'We understand this to be a correct rule. We cannot perceive upon what ground a landlord who by a lease has restricted the possession and use of his tenant by metes and bounds to a part of a larg-

er tract can claim that his tenant's possession under such lease extends to that which by the terms of the lease the tenant has no right to possess.'"

A more careful examination of the authorities and evidence in this case leads us to the conclusion that this lease is restrictive in its nature, and falls within the rule announced in the Kimball Case, and therefore cannot be made the basis upon which to extend constructive possession to the entire league.

We do not consider that our decision in the instant case is in conflict with the case of Frazier v. Houston Oil Co., 161 S. W. 20. In the Frazier Case, it was admitted that the legal title to all of the land in controversy was in the Houston Oil Company, and that appellant could only recover, if at all, under the ten-year statute of limitation. The claimant was a naked trespasser, having actual possession of only 12 acres of land, including his improvements, and had no color of title upon which to base constructive possession to 160 acres of land. The admitted owner of the land, the Houston Oil Company, was in actual possession, through a tenant, claiming and holding under a lease contract therein set out.

[30, 31] Now, the law is well settled that the true owner of land has constructive possession and seisin of all the land to which he has title, if there be no other person in possession. If, however, there be some other person in possession of a part, under color of title, giving boundaries, such possession, if adverse in its nature, though the possessor enters and holds under inferior title, will create a disseisin of the holder of the superior title to the extent of the boundaries contained in the inferior title, unless the holder of the superior title is in actual possession of some part of the land covered by his title.

[32] If the possessor be without deed or other written memorandum defining the possession—that is, if the claimant be a mere naked trespasser—limitation will be confined to the extent of the actual inclosure. Craig v. Cartwright, 65 Tex. 413. In the case of Evitts v. Roth, 61 Tex. 84, the Supreme Court, discussing this subject, said:

"In Hunnicutt v. Peyton, 102 U. S. 333 [26 L. Ed. 113], it was held that, where a party enters upon unoccupied land under color of title, and holds the same adversely, his holding will extend to the land included within the boundaries defined by his deed, and to that extent the real owner is disseized. But, if the real owner is on any part of the land, his constructive seisin extends to all of the land not in fact occupied by the other."

In the case referred to above, Hunnicutt v. Peyton, 102 U. S. 368, 26 L. Ed. 121, the court, speaking through Justice Strong, says:

"If the true owner be at the same time in actual possession of part of the land, claiming title to the whole, the constructive possession is in him of all the land not in the actual possession of the intruder, and this though the owner's actual possession is not within the limits of the defective title. 'The reason is plain. Both parties cannot be seised at the same time of the same land under different titles. The law therefore adjudges the scisin of all that is not in the actual occupancy of the adverse party to him who has the better title.' These distinctions are clearly shown in the cases cited from [Clarke v. Courtney] 5 Pet. [319, 8 L. Ed. 140], supra."

See, also, the case of Whitehead v. Foley, 28 Tex. 289.

The lease under investigation in the Frazier Case was not being considered as the basis of a limitation title to the land in controversy, but simply as a circumstance to show actual possession of a part of the land through a tenant who agreed to hold possession of the whole, so as to limit the recovery of the naked trespasser under the rules above stated to his actual inclosure. Quite another and different set of rules are applicable to such leases when they are made the basis of an adverse claim to land, and what is said in the Frazier Case about the language used in the lease, not having the effect of limiting the possession and use to the improvements, must be viewed in the light of this distinction, and limited to the facts to which it was intended to apply.

We are unable to harmonize our views of the lease contract in question and the conclusions of adverse possession thereunder with the principle announced in the case of Hanks v. Houston Oil Co., 173 S. W. 635, and therefore this opinion is in conflict therewith. In the Hanks Case, the appellant sued the Houston Oil Company in trespass to try title for the A. W. Smith league of land in Hardin county. Defendant pleaded not guilty and the three, five, and ten year statutes of limitation. In answer to the plea of limitation the plaintiff pleaded by supplemental petition that the defendant, in the absence of the five-year statute, would deraign title through a forged deed, to wit, through and under a purported deed from A. W. Smith to John R. Stevens, which deed plaintiff alleged was forged. Upon the close of the evidence the court instructed a verdict for the defendants, without indicating upon what particular issue the instruction was based. Upon consideration of the cause in the appellate court that court found that the evidence attacking the deed in question as a forgery was not sufficient to establish that issue, and therefore, as a logical result of this holding, the title was placed in the Houston Oil Company to the land in controversy, and it was the true owner thereof. In addition to this holding, the court also found that appellee had perfected title to said land under the five-year statute of limitation, and upon that issue discussed a lease contract which was the counterpart of the one under investigation in the instant case, saying:

"We think that, under the foregoing undisputed facts, every element essential to a title under the five-year statute was proved. Here we have the assertion of a claim under a duly registered deed, and actual adverse possession

with cultivation, use, and enjoyment of a part by a tenant which drew to it the constructive possession of the claimant to the whole, and the payment of all taxes concurrently with such actual possession; the whole covering a period of full five years. It is our opinion, therefore, that upon the theory that appellee had title under the five-year statute of limitation, the court did not err in instructing a verdict for appellee."

As we have heretofore stated, we do not understand the five-year statute of limitation to mature title, where the occupant, even though claiming under color of title, is in actual adverse possession of a part of the land, through a tenant, with cultivation, use, and enjoyment of a part only of such land. The only effect of color of title, in so far as the statute of limitations is concerned, is to fix the character of the occupant's possession and to define its extent and limits. Two of the requisites of the statute are that the claimant must have peaceable and adverse possession of the land and cultivation and use or enjoyment of the same. There must be adverse possession and claim to the whole. Actual possession of part of the land under color of title, with adverse claim to the part in actual possession only, will not draw to it constructive possession of the balance. The claim to the land and the adverse holding thereof must be coextensive with the boundaries of the conveyance. 1 Cyc. 1134; Pope v. Riggs, 43 S. W. 306.

[33] There must also be an open, notorious exercise of dominion and control over all of the land to constructively extend the limits of actual possession of a part of the land to the boundaries included under the color of title. Mere possession alone, either actual or constructive, will never mature a limitation title. In order to perfect title by adverse holding, the law contemplates that the true owner must have had actual knowledge of the hostile claim, or the possession must have been so open, visible, and notorious and the dominion exercised over the land of such a character as to raise the presumption of notice to the world that the rights of the true owner are invaded intentionally and with a purpose to assert a claim of title adversely to his. It is not the purpose of limitation statutes to give title to land through a trick or artifice, or through a secret mental process working between the minds of a tenant and one claiming land under color of title, but rather does it seek to assist the one who comes out in the clear light of day and asserts by his acts such dominion over all of the land he claims, although he may have but a small part of it in actual possession, that he who looks may know the hostile purpose and intent upon his part to hold it against the true owner.

There being a conflict between this opinion and the opinion of the Court of Civil Appeals in the case of Powell v. Heckerman, 6 Tex. Civ. App. 304, 25 S. W. 166, on the question

of a judgment against a prior vendor involving the title to real estate being available by a subsequent vendee as res adjudicata in another action in which he is being sued for the same land, and also a conflict between the opinion in this case and the opinion of the Court of Civil Appeals on the question of the restrictive character of the lease contract under investigation, and the perfection of limitation title thereto by reason of the application of the five-year statute, as announced in the Hanks Case, supra, this cause, upon the questions here stated, will be certified to the Supreme Court for final adjudication.

### On Second Motion for Rehearing.

[34] We find that we were in error in determining to certify to the Supreme Court the question of the conflict between this opinion and the Hanks Case, supra, on the subject of the restrictive nature of the lease. Our opinion follows the ruling of the Supreme Court in the Kimball Case, 114 S. W. 668. It was not intended to require the certification of a question already determined by the Supreme Court, although there may be a conflict with the subsequent decision of a Court of Civil Appeals. Yoacham v. McCurdy, 27 Tex. Civ. App. 183, 65 S. W. 213.

[35] We adhere, however, to our former conclusion, that there is a conflict between this case and the Heckerman Case, supra, which necessitates a certification by us of the question in conflict for final adjudication to the Supreme Court.